# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| BENCHMARK ELECTRONICS, INC.; BENCHMARK ELECTRONICS HUNTSVILLE, INC.; BENCHMARK ELECTRONICS MANUFACTURING SOLUTIONS (MOORPARK), INC.; BENCHMARK ELECTRONICS MANUFACTURING SOLUTIONS, INC.; BENCHMARK ELECTRONICS PHOENIX, INC.; BENCHMARK ELECTRONICS TIJUANA, S. DE R.L. DE C.V.; AND BENCHMARK ELECTRONICS DE MEXICO S. DE R.L. DE C.V., | |
| Plaintiffs, | |
| vs. | CASE NO. _____ |
| AVX CORPORATION; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; SANYO ELECTRIC CO., LTD.; SANYO NORTH AMERICA CORPORATION; NEC TOKIN CORPORATION; NEC TOKIN AMERICA, INC.; NIPPON CHEMI-CON CORPORATION; UNITED CHEMI-CON, INC.; HITACHI CHEMICAL CO., LTD.; HITACHI AIC INC.; HITACHI CHEMICAL CO. AMERICA, LTD.; FUJITSU LTD.; NICHICON CORPORATION; NICHICON (AMERICA) CORPORATION; KEMET CORPORATION; KEMET ELECTRONICS CORPORATION; RUBYCON CORPORATION; RUBYCON AMERICA INC.; ELNA CO., LTD.; ELNA AMERICA INC.; MATSUO ELECTRIC CO., LTD.; TOSHIN KOGYO, LTD.; HOLY STONE ENTERPRISE CO., LTD.; MILESTONE GLOBAL TECHNOLOGY, INC. (D/B/A HOLYSTONE INTERNATIONAL); VISHAY POLYTECH CO., LTD.; ROHM CO., LTD.; ROHM SEMICONDUCTOR U.S.A., LLC; OKAYA ELECTRIC INDUSTRIES CO., LTD.; OKAYA ELECTRIC AMERICA, INC.; TAITSU CORPORATION; TAITSU AMERICA, INC.; SHINYEI KAISHA; SHINYEI TECHNOLOGY CO., LTD.; SHINYEI CAPACITOR CO., LTD.; SHINYEI CORPORATION OF AMERICA, INC.; NITSUKO ELECTRONICS CORPORATION; NISSEI ELECTRIC CO., LTD.; SHIZUKI ELECTRIC CO., LTD.; SOSHIN ELECTRIC CO., LTD.; AND SOSHIN ELECTRONICS OF AMERICA, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

**COMPLAINT**

Plaintiffs Benchmark Electronics, Inc., Benchmark Electronics Huntsville, Inc., Benchmark Electronics Manufacturing Solutions (Moorpark), Inc., Benchmark Electronics Manufacturing Solutions, Inc., Benchmark Electronics Phoenix, Inc., Benchmark Electronics Tijuana, S. de R.L. de C.V. and Benchmark Electronics de Mexico S. de R.L. de C.V. (collectively, "Benchmark Electronics" or "Plaintiffs"), bring this action for damages under the antitrust laws of the United States against defendants AVX Corporation; Panasonic Corporation; Panasonic Corporation of North America; SANYO Electric Co., Ltd.; SANYO North America Corporation; NEC TOKIN Corporation; NEC TOKIN America, Inc.; Nippon Chemi-Con Corporation; United Chemi-Con, Inc.; Hitachi Chemical Co., Ltd.; Hitachi AIC Inc.; Hitachi Chemical Co. America, Ltd.; Fujitsu Ltd.; Nichicon Corporation; Nichicon (America) Corporation; KEMET Corporation; KEMET Electronics Corporation; Rubycon Corporation; Rubycon America Inc.; ELNA Co., Ltd.; ELNA America Inc.; Matsuo Electric Co., Ltd.; TOSHIN KOGYO., Ltd.; Holy Stone Enterprise Co., Ltd.; Milestone Global Technology, Inc. (D/B/A HolyStone International); Vishay Polytech Co., Ltd.; ROHM Co., Ltd.; ROHM Semiconductor U.S.A., LLC; Okaya Electric Industries Co., Ltd.; Okaya Electric America Inc.; Taitsu Corporation; Taitsu America, Inc.; Shinyei Kaisha; Shinyei Technology Co., Ltd.; Shinyei Capacitor Co., Ltd.; Shinyei Corporation of America, Inc.; Nitsuko Electronics Corporation; Nissei Electric Co., Ltd.; Shizuki Electric Co., Ltd.; Soshin Electric Co., Ltd.; and Soshin Electronics of America, Inc. (collectively, the "Defendants"), and alleges as follows:

## I.   INTRODUCTION

1.     Defendants and their co-conspirators (together, "Conspirators") formed an international cartel that conducted a long-running conspiracy (the "Conspiracy"), which extended from at least September 1, 1997 through March 31, 2014 (the "Conspiracy Period"). The purpose and effect of this conspiracy was to fix, stabilize and maintain prices for aluminum, tantalum and film capacitors (together, "Affected Capacitors").

2.     Capacitors are integral components found in virtually all electronic devices—from simple household appliances, to computers, automobiles and sophisticated industrial, telecommunication, medical and aerospace technology products.  Capacitors store electrical energy and help regulate the flow of electrical current as it moves through a circuit.

3.     Because the functions of capacitors are fundamental to the operation of practically all electronic devices, capacitors are sold in large volume, and demand is immense. In 2003, Global revenues for all manufacturers in the capacitor industry totaled approximately $16 billion based on the sales of trillions of capacitors.  Industry analysts estimated that global revenues from the sale of capacitors would reach over $20 billion by 2016.

4.     In spite of their critical functions, the vast majority of capacitors are very small—sometimes the size of a pencil point—and typically cost no more than a few cents, and often as little as a fraction of a cent.  Capacitors of like capacitance, dielectric and form factor also are generally interchangeable despite different manufacturers.  As a result, the price of these products is the primary differentiation for purchasers.

5.     The commoditized nature of capacitors in conjunction with the mature nature of the industry, significantly high barriers to entry, and necessary economies of scale render the capacitors market especially susceptible to anticompetitive activity.  This allowed

641354.1

and enabled the efforts by Conspirators to raise, maintain or stabilize prices, or to reduce the supply of Affected Capacitors, which artificially inflated prices above those that would prevail in a competitive market.

6.     At the advent of the Conspiracy Period, Conspirators had begun to experience reduced profit margins as a result of increased competition among manufacturers of Affected Capacitors and the rise in popularity of considerably cheaper ceramic capacitors.  To bolster the profitability of their respective Affected Capacitors sales, and to negate the impact of declining demand on price, Conspirators—commencing as early as September 1997 and continuing throughout the Conspiracy Period—combined, conspired and agreed to curtail competition of Affected Capacitors among themselves by fixing prices, allocating customers through bid-rigging and constraining their manufacturing output.

7.     These anticompetitive agreements and understandings were reached during regular and ad hoc group and bilateral meetings and communications during which Conspirators discussed and coordinated strategy for achieving their desired anticompetitive ends.  Conspirators agreed at these meetings and through these communications to uniformly price their competing Affected Capacitors in order to increase profitability.  They also discussed how to justify and convey their collusive manufacturing, delivery and pricing changes to customers and the market.

8.     Both in the course of these live meetings, as well as through written and oral communications, Conspirators exchanged confidential and commercially sensitive information regarding Affected Capacitors, including customer and industry-specific price requests, current and future prices, anticipated timing of pricing changes, sales volume, production capacity, production lead times, profitability, availability and cost of raw materials.

Conspirators used this data to determine concerted prices, allocate customers and otherwise facilitate the Conspiracy.

9.     Conspirators adhered to these collusive agreements and understandings as they issued bids and price announcements and "negotiated" prices with their customers—selling Affected Capacitors at inflated non-competitive prices throughout the Conspiracy Period.

10.     Competitors for common customers coordinated their respective bids to secure mutual market shares consistent with their production capacities, agreeing in advance which seller should win the bid and what their respective initial and final offers should be to guarantee that outcome.  Conspirators urged one another "not to give in" to customers' requests for price reductions, and to avoid being drawn in to "price wars."

11.     Through their collusive, anticompetitive actions, Conspirators effectively negated, and reversed the normal economic benefits of increased competition, and thus cost their customers hundreds of millions of dollars in overcharges.

12.     Meanwhile, Defendants took pains to conceal their anticompetitive and unlawful conduct from their customers, regulators and the public.  The Conspiracy remained an international secret until the spring of 2014, when law enforcement and competition authorities around the globe first publicly acknowledged their respective investigations into anticompetitive conduct in the capacitor industry.  By that time, customers like Benchmark Electronics had been paying artificially inflated prices for Affected Capacitors for approximately 17 years.

13.     In 2014, Defendant Panasonic Corporation, on behalf of itself and its wholly owned subsidiaries (Defendants Panasonic Corporation of North America, SANYO Electric Co., Ltd., and SANYO North America Corporation), admitted to the U.S. Department of Justice ("DOJ") that Conspirators engaged in a conspiracy to fix the prices of Affected

Capacitors beginning no later than, January 1, 2003 and that Conspirators' cartel activities were undertaken for the purpose of artificially maintaining and inflating prices of aluminum, tantalum and film capacitors sold to United States purchasers and purchasers worldwide.

14.     On September 2, 2015, the DOJ filed an Information charging Defendant NEC TOKIN Corporation with "knowingly" joining and participating in a conspiracy violating Section 1 of the Sherman Act by entering into and engaging in a combination and conspiracy "to suppress and eliminate competition by fixing and rigging bids of certain electrolytic capacitors in the United States and elsewhere" from "at least as early as April 2002 until in or about December 2013."  In addition, the Information dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014."  On January 25, 2016, NEC TOKIN Corporation pleaded guilty to conspiracy to fix the prices of electrolytic capacitors as charged in the Information.

15.     On April 7, 2016, the DOJ announced that Hitachi Chemical Co., Ltd. agreed to plead guilty to conspiring with competitors to fix prices for electrolytic capacitors sold to customers in the United States and elsewhere.  Like the DOJ's Information against NEC TOKIN, the DOJ's Information against Hitachi also dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014."  The Information charged Hitachi Chemical Co., Ltd. with "knowingly" joining and participating in a conspiracy with its competitors between 2002 and 2010.  On June 9, 2016, Hitachi Chemical Co., Ltd. pleaded guilty to conspiring to fix the prices of electrolytic capacitors as charged in the Information.

16.     On August 22, 2016, the DOJ announced that Rubycon Corporation, ELNA Co., Ltd., and Holy Stone Holdings Co., Ltd. had agreed to plead guilty for conspiring to fix prices for electrolytic capacitors sold to customers in the United States and elsewhere.

The DOJ's Information against Rubycon Corporation charged the company with conspiring with its competitors to fix prices and rig bids for certain electrolytic capacitors in the United States and elsewhere.   The Information charged that Rubycon Corporation "knowingly joined and participated in the charged conspiracy from at least as early as August 2002 until in or about January 2014.   In addition, the Information dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014."   On October 12, 2016, Defendant Rubycon Corporation pleaded guilty to conspiring to fix the prices of electrolytic capacitors as charged in the Information.

17.   The DOJ's Information against ELNA Co., Ltd. charged the company with conspiring with its competitors to fix prices and rig bids for certain electrolytic capacitors in the United States and elsewhere.   The Information charged that ELNA Co., Ltd. "knowingly joined and participated in the charged conspiracy from at least as early as August 2002 until in or about January 2014.   In addition, the Information dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014."

18.   The DOJ's Information against Holy Stone Holdings Co., Ltd. charged the company with conspiring with its competitors to fix prices and rig bids for certain electrolytic capacitors in the United States and elsewhere.   The Information charged that Holy Stone Holdings Co., Ltd. "knowingly joined and participated in the charged conspiracy from in or about April 2010 until in or about January 2014."   In addition, the Information dated the conspiracy from "at least as early as September 1997" until "in or about January 2014."

19.   On February 8, 2017, the DOJ announced that Matsuo Electric Co., Ltd. agreed to plead guilty to conspiring with competitors to fix prices and rig bids for electrolytic capacitors sold to customers in the United States and elsewhere.   The DOJ's Information

charged that Matsuo Electric Co., Ltd "knowingly joined and participated in the charged conspiracy from at least as early as November 2001 until in or about January 2014."  The Information dated the conspiracy from "at least as early as September 1997" until "in or about January 2014."

20.     In addition to the corporate defendants, the DOJ has also charged ten of Defendants' executives with conspiring to fix prices and rig bids for electrolytic capacitors.

21.     During the Conspiracy Period, Benchmark Electronics purchased Affected Capacitors in the United States directly from Conspirators, and, as a result of the Conspiracy, paid higher prices than would have prevailed in a competitive market.  Benchmark Electronics thus suffered damages as a consequence of the Conspiracy.  Benchmark Electronics brings this action to recover the overcharges it paid for Affected Capacitors purchased by Benchmark Electronics during the Conspiracy Period.

## II.     <u>JURISDICTION AND VENUE</u>

22.     Benchmark Electronics brings this action to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' price-fixing and bid-rigging in violation of Section 1 of the Sherman Act (15U.S.C.§ 1).

23.     This Court has subject matter jurisdiction over this action pursuant to Section 4 of the Clayton Act (15 U.S.C. §§ 15(a)) and 28 U.S.C. §§ 1331 and 1337.

24.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on United States domestic and import trade or commerce.  This effect gives rise to Benchmark Electronics' antitrust claim.

During the Conspiracy Period, the Conspiracy directly and substantially affected the price of Affected Capacitors purchased in the United States.

25.     This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22).  In addition, Defendants and their co-conspirators purposefully availed themselves of the laws of the United States as they manufactured Affected Capacitors for sale in the United States, and their conspiratorial conduct had a substantial effect on interstate and foreign trade and commerce.

26.     Venue is proper in the Southern District of Texas under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District, is licensed to do business in this District and/or transacts business in this District.

## III.   PARTIES

### A.     Plaintiffs

27.     Benchmark Electronics is a Texas corporation with its principal place of business at 3000 Technology Drive, Angleton, Texas 77515.   Benchmark Electronics is a full-service electronic manufacturing services company and is a major purchaser of electronic components, including capacitors, in the U.S.   Benchmark Electronics directly purchased Affected Capacitors in the United States from certain Conspirators during the Conspiracy Period, and has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.   Benchmark brings claims on behalf of itself and its affiliates, subsidiaries and predecessors-in-interest.

28.     Benchmark Electronics Huntsville, Inc. is an Alabama corporation with its principal place of business at 4807 Bradford Drive, Huntsville, AL 35805.   Benchmark Electronics Huntsville, Inc. directly purchased Affected Capacitors in the United States from certain Conspirators during the Conspiracy Period, and has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.

29.     Benchmark Electronics Manufacturing Solutions (Moorpark), Inc. is a California corporation with its principal place of business at 200 Science Drive, Moorpark, CA 93021.  Benchmark Electronics Manufacturing Solutions (Moorpark), Inc. directly purchased Affected Capacitors in the United States from certain Conspirators during the Conspiracy Period, and has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.

30.     Benchmark Electronics Manufacturing Solutions, Inc. is a Delaware corporation with its principal place of business at 5550 Hellyer Avenue, San Jose, CA 95138. Benchmark Electronics Manufacturing Solutions, Inc. directly purchased Affected Capacitors in the United States from certain Conspirators during the Conspiracy Period, and has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.

31.     Benchmark Electronics Phoenix, Inc. is a Delaware corporation with its principal place of business at 2222 West Pinnacle Peak Road, Suite 310, Phoenix, AZ 85027. Benchmark Electronics Phoenix, Inc. directly purchased Affected Capacitors in the United States from certain Conspirators during the Conspiracy Period, and has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.

32.     Benchmark Electronics Tijuana, S. de R.L. de C.V. is a Mexican corporation with its principal place of business at Ave. Produccion No. 20 Modulo C, Parque Industrial Internacional, Tijuana, Baja California 22425 Mexico.   Benchmark Electronics Tijuana, S. de R.L. de C.V. directly purchased Affected Capacitors in the United States from

10

certain Conspirators during the Conspiracy Period, and has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.

33.     Benchmark Electronics de Mexico S. de R.L. de C.V. is a Mexican corporation with its principal place of business at Circuito de la Productividad No. 132-A, Parque Industrial Guadalajara, Las Pintas, El Salto, Jalisco 45690 Mexico.   Benchmark Electronics de Mexico S. de R.L. de C.V. directly purchased Affected Capacitors in the United States from certain Conspirators during the Conspiracy Period, and has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct.

### B.     Defendants

### Panasonic/SANYO

34.     Defendant Panasonic Corporation is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Until October 1, 2008, Panasonic Corporation operated under the name of Matsushita Electric Industrial Co., Ltd. ("Matsushita").   During the Conspiracy Period, Panasonic Corporation manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

35.     Defendant Panasonic Corporation of North America ("PCNA"), a wholly owned subsidiary of Panasonic Corporation, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102.   During the Conspiracy Period, PCNA—either directly or through its business units, subsidiaries, agents or affiliates (including, without limitation, Panasonic Industrial Sales Company)—sold and

11

distributed to United States purchasers aluminum, tantalum and film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Panasonic Corporation.

36.     Defendant SANYO Electric Co., Ltd. ("SANYO Co."), a Japanese corporation, is a wholly owned subsidiary of Panasonic Corporation, with its principal place of business located at 15-5, Keihan-Hondori, 2-Chome, Moriguchi City, Osaka 570-8677, Japan. During the Conspiracy Period, SANYO Co. manufactured, sold and distributed aluminum and tantalum capacitors, either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.  Prior to Panasonic Corporation's acquisition of a controlling interest in SANYO Co. in December 2009, SANYO Co. had no corporate affiliation with Panasonic Corporation or its business units, subsidiaries, agents or affiliates.

37.     Defendant SANYO North America Corporation ("SANYO NA"), a Delaware corporation, is a wholly owned subsidiary of SANYO Co., with its principal place of business located at 2055 Sanyo Avenue, San Diego, California 92154.  During the Conspiracy Period, SANYO NA—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum and tantalum capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, SANYO Co.

38.     Defendants Panasonic Corporation and PCNA are together referred to herein as "Panasonic."  Defendants SANYO Co. and SANYO NA are together referred to herein as "SANYO," and, together with Panasonic, the entities are referred to herein as "Panasonic/SANYO."

## NEC TOKIN

39.   Defendant NEC TOKIN Corporation ("NEC TOKIN Corp."), a Japanese corporation, has its principal place of business located at 7-1, Khriyama 6-chome, Taihaku-ku, Sendai-shi, Miyagi 982-8510, Japan.   During the Conspiracy Period, NEC TOKIN manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

40.   Defendant NEC TOKIN America, Inc. ("NEC TOKIN America"), a California corporation, is a wholly owned subsidiary of NEC TOKIN Corp. with its principal place of business located at 2460 North First Street, Suite 220, San Jose, California 95131. During the Conspiracy Period, NEC TOKIN America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum and tantalum capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, NEC TOKIN Corp.

41.   Defendants NEC TOKIN Corp. and NEC TOKIN America are together referred to herein as "NEC TOKIN."

## Nippon Chemi-Con

42.   Defendant Nippon Chemi-Con Corporation ("NCC") is a Japanese corporation with its principal place of business located at 5-6-4, Osaki, Shinagawa-ku, Tokyo 141-8605, Japan.   During the Conspiracy Period, NCC manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

43.   Defendant United Chemi-Con, Inc. ("UCC"), an Illinois Corporation, is a wholly owned subsidiary of NCC with its principal place of business located at 9801 West

13

641354.1

Higgins Road, Rosemont, Illinois 60018.  During the Conspiracy Period, UCC—either directly or through its business units, subsidiaries, agents or affiliates, or those of its corporate parent, NCC—manufactured, sold and distributed aluminum, tantalum and film capacitors to United States purchasers.

44.    Defendants NCC and UCC are together referred to herein as "Nippon Chemi-Con."

**KEMET**

45.    Defendant KEMET Corporation ("KEMET Corp.") is a Delaware corporation with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681.  During the Conspiracy Period, KEMET Corp. manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates—including, without limitation, KEMET Electronics Corporation—to United States purchasers.

46.    Defendant KEMET Electronics Corporation ("KEC"), a Delaware corporation, is a wholly owned subsidiary of KEMET Corp. with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681.  During the Conspiracy Period, KEC—either directly or through its business units, subsidiaries, agents, or affiliates— sold and distributed to United States purchasers aluminum, tantalum and film capacitors manufactured by certain of its own business units, subsidiaries, agents or affiliates or those of its corporate parent, KEMET Corp.

47.    KEC is the alter ego of KEMET Corp.  Although separate corporate entities, KEMET Corp. and KEC are functionally a single economic and operational entity.  As detailed below, KEMET Corp. did not recognize the corporate distinction between KEMET

14

Corp. and KEC and frequently used those corporate names interchangeably to refer to the signatory of particular agreements, often simply referring to the company as "KEMET."  The "History of KEMET" webpage, for example, refers to "KEMET" without distinguishing between KEMET Corp. or KEC.

48.     KEMET Corp. and KEC are together referred to herein together as "KEMET."

**Hitachi**

49.     Defendant Hitachi Chemical Co., Ltd. ("Hitachi Chemical"), is a Japanese corporation with its principal place of business located at Grantokyo South Tower, 1-9-2, Marunouchi, Chiyoda-ku, Tokyo 100-6606, Japan.  During the Conspiracy Period, Hitachi Chemical manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

50.     Defendant Hitachi AIC Inc. ("Hitachi AIC"), a Japanese corporation, is a wholly owned subsidiary of Hitachi Chemical with its principal place of business located at 1065, Kugeta, Moka-Shi Tochigi 321-4521, Japan.  During the Conspiracy Period, Hitachi AIC—either directly or through its divisions, business units, subsidiaries, agents or affiliates— sold and distributed to United States purchasers aluminum, tantalum and film capacitors manufactured by its own business units, subsidiaries, agents or affiliates or those of its corporate parent, Hitachi Chemical.

51.     In or about December 2009, Hitachi AIC sold its tantalum and niobium capacitors division to Defendant Holy Stone Enterprise Co., Ltd.   The acquisition was completed by or about April 1, 2010, and the tantalum and niobium capacitors division was

renamed Holy Stone Polytech Co., Ltd. ("Holy Stone Polytech"), a Japanese corporation and wholly owned subsidiary of Holy Stone Enterprise Co., Ltd.

52. Defendant Hitachi Chemical Co. America, Ltd. ("Hitachi Chemical America"), a New York corporation, is a wholly owned subsidiary of Hitachi Chemical with its principal place of business located at 10080 North Wolfe Road, Suite SW3-200, Cupertino, California 95014. During the Conspiracy Period, Hitachi Chemical America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum and tantalum capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Hitachi Chemical (including, without limitation, Hitachi AIC).

53. Defendants Hitachi Chemical, Hitachi AIC, and Hitachi Chemical America are together referred to herein as "Hitachi."

**Fujitsu**

54. Defendant Fujitsu Ltd. ("Fujitsu") is a Japanese corporation with its principal place of business located at Shiodome City Center, 1-5-2 Higashi-Shimbashi, Minato-ku, Tokyo 105-7123, Japan.

55. During the Conspiracy Period, Fujitsu manufactured, sold and distributed aluminum, tantalum and film capacitors. Fujitsu conducted its capacitors business directly and through its now dissolved wholly owned subsidiary, Fujitsu Media Devices, Ltd. ("FMD"), which acted on its behalf with regard to the pricing, manufacture, sale and distribution of capacitors. At all times, Fujitsu represented that it was the owner of the capacitors business that was "operated by FMD."

16

56.     In its public statement on May 21, 2009— which was repeated in its 2009 annual report—Fujitsu announced that it "[s]old [sic] capacitors business (operated by Fujitsu Media Devices)."  Less than a year after the sale, Fujitsu dissolved FMD entirely and merged FMD's remaining assets into Fujitsu.

### Nichicon

57.     Defendant Nichicon Corporation ("Nichicon Corp.") is a Japanese corporation with its principal place of business located at Karasumadori Oike-agaru, Nakagyo-ku, Kyoto 604-0845, Japan.  During the Conspiracy Period, Nichicon Corp. manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

58.     Defendant Nichicon (America) Corporation ("Nichicon America"), an Illinois corporation, is a wholly owned subsidiary of Nichicon Corp. with its principal place of business located at 927 East State Parkway, Schaumburg, Illinois 60173.    During the Conspiracy Period, Nichicon America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum, tantalum and film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Nichicon Corp.

59.     Defendants Nichicon Corp. and Nichicon America are together referred to herein as "Nichicon."

### AVX

60.     Defendant AVX Corporation ("AVX") is a Delaware corporation with its principal place of business located at One AVX Boulevard, Fountain Inn, South Carolina 29644. During the Conspiracy Period, AVX manufactured, sold and distributed aluminum, tantalum

17

and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

61.    In or around February 2013, AVX acquired Nichicon's tantalum electrolytic capacitors division.

**Rubycon**

62.    Defendant Rubycon Corporation ("Rubycon Corp.") is a Japanese corporation with its principal place of business located at 1938-1, Nishi-Minowa, Ina-City, Nagano 399-4593, Japan.  During the Conspiracy Period, Rubycon Corp. manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

63.    Defendant Rubycon America Inc. ("Rubycon America"), an Illinois corporation, is a wholly owned subsidiary of Rubycon Corp. with its principal place of business located at 4293 Lee Avenue, Gurnee, Illinois 60031.  During the Conspiracy Period, Rubycon America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum, tantalum and film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Rubycon Corp.

64.    Defendants Rubycon Corp. and Rubycon America are together referred to herein as "Rubycon."

**ELNA**

65.    Defendant ELNA Co., Ltd. ("ELNA Co."), is a Japanese corporation with its principal place of business located at 3-8-11 Shin-Yokohama, Kohoku-ku, Yokohama, Kanagawa Prefecture 222-0033, Japan.   During the Conspiracy Period, ELNA Co.

18

manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

66.     Defendant ELNA America Inc., ("ELNA America") a California corporation, is a wholly owned subsidiary of ELNA Co. with its principal place of business located at 879 West 190th Street, Suite 100, Gardena, California 90248.  During the Conspiracy Period, ELNA America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum, tantalum and film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, ELNA Co.

67.     Defendants ELNA Co. and ELNA America are together referred to herein as "ELNA."

**Matsuo**

68.     Defendant Matsuo Electric Co., Ltd. ("Matsuo") is a Japanese corporation with its principal place of business located at 3-5- Sennari-cho, Toyonaka-shi, Osaka 561-8558, Japan.  During the Conspiracy Period, Matsuo manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

**TOSHIN KOGYO**

69.     Defendant TOSHIN KOGYO Co., Ltd. ("TOSHIN KOGYO") is a Japanese corporation with its principal place of business at Tsukasa Bldg. 2-15-4, Uchikanda Chiyoda-ku, Tokyo, Japan.  During the Conspiracy Period, TOSHIN KOGYO manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates, to United States purchasers.

**Holy Stone**

70.     Defendant Holy Stone Enterprise Co., Ltd. ("Holy Stone Enterprise") is a Taiwanese corporation with its principal place of business at 1 Floor, No. 62, Sec. 2, Huang Shan Road, Nei Hu District, Taipei, Taiwan.  From in or about December 2009 until on or about June 11, 2014, Holy Stone Enterprise manufactured, sold and distributed tantalum capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

71.     During the Conspiracy Period, Holy Stone Enterprise publicly announced its acquisition of Hitachi AIC's tantalum and niobium capacitors division.  The acquisition was completed on or about April 1, 2010, and that division was renamed Holy Stone Polytech Co., Ltd. ("Holy Stone Polytech"), a Japanese corporation and wholly owned subsidiary of Holy Stone Enterprise with its principal place of business located at Ohdaira, Miharu, Fukushima 963-7704, Japan.  On or about June 11, 2014, Vishay Intertechnology, Inc. announced its acquisition of Holy Stone Polytech from Holy Stone Enterprise.  From in or about December 2009 until on or about June 11, 2014, Holy Stone Polytech—either directly or through its business units, subsidiaries, agents or affiliates, or those of its corporate parent, Holy Stone Enterprise—manufactured, sold and distributed tantalum capacitors to United States purchasers.

72.     Defendant Milestone Global Technology, Inc. ("Milestone")—which does business as HolyStone International ("HolyStone International"), an entity which Holystone Enterprise publicly claims to be a "subsidiary company" of Holy Stone Enterprise and its "direct sales office for North America"—is a California corporation with its principal place of business located at 27475 Ynez Road #288, Temecula, California 92591.

73.     From in or about December 2009, Milestone, doing business as HolyStone International, either directly or through its business units, subsidiaries, agents or affiliates, sold and distributed to United States purchasers tantalum capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Holy Stone Enterprise (including, without limitation, Holy Stone Polytech).

74.     Holy Stone Enterprise, Holy Stone Polytech and Milestone, doing business as HolyStone International, are together referred to herein as "Holy Stone."

**Vishay Polytech**

75.     On or about June 11, 2014, Vishay Intertechnology, Inc. ("Vishay") announced its acquisition of Holy Stone Polytech from Holy Stone through a Stock Purchase Agreement.   Holystone Polytech, now renamed as Defendant Vishay Polytech Co., Ltd. ("Vishay Polytech"), is a Japanese corporation and a wholly owned subsidiary of Vishay Israel Limited ("Vishay Israel," a wholly owned subsidiary of Vishay) with its principal place of business located at Ohdaira, Miharu, Fukushima 963 7704, Japan.  From on or about June 11, 2014 to date, Vishay Polytech, either directly or through the business units, subsidiaries, agents or affiliates of its corporate parent, Vishay, manufactured, sold and distributed tantalum capacitors to United States purchasers.

76.     Pursuant to the terms of the June 11, 2014 Stock Purchase Agreement among Vishay, Vishay Israel, Holy Stone Enterprise, and Holy Stone Holding Co., Ltd., Holy Stone Enterprise agreed to hold the Vishay entities harmless from and against any and all losses that may be arising out of, based upon or resulting from any claims relating to "the investigations, which began in March 2014 in the U.S., the Republic of China, the Peoples' Republic of China, and Japan and in April 2014 in the European Union . . . into alleged or actual

21

violation of, or non-compliance with, any Applicable Law relating to antitrust, unfair competition, or similar matters."

**ROHM**

77.     Defendant ROHM Co., Ltd. ("ROHM Co.") is a Japanese corporation with its principal place of business located at 21 Saiin Mizosaki-cho, Ukyo-ku, Kyoto 615-8585, Japan.  During the Conspiracy Period, ROHM manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

78.     Defendant ROHM Semiconductor U.S.A., LLC ("ROHM USA"), a Delaware limited liability corporation, is a subsidiary of ROHM Co. with its principal place of business located at 2323 Owen Street, Suite 150, Santa Clara, California 95054.  During the Conspiracy Period, ROHM USA, either directly or through its business units, subsidiaries, agents or affiliates, sold and distributed to United States purchasers aluminum, tantalum and film capacitors manufactured by certain business units, subsidiaries, agents or affiliates of its corporate parent, ROHM Co.

79.     Defendants ROHM Co. and ROHM USA, are together referred to herein as "ROHM."

**Okaya**

80.     Defendant Okaya Electric Industries Co., Ltd. ("Okaya Co.") is a Japanese corporation with its principal place of business located at 16-9, Todoroki 6 chome, Setagaya-ku, Tokyo 158-8543, Japan.  During the Conspiracy Period, Okaya Co. manufactured, sold and distributed film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

641354.1

81.     Defendant Okaya Electric America Inc. ("Okaya America"), an Indiana corporation, is a wholly owned subsidiary of Okaya Co. with its principal place of business located at 52 Marks Road, Suite 1, Valparaiso, Indiana 46383.  During the Conspiracy Period, Okaya America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Okaya Co.

82.     Defendants Okaya Co. and Okaya America are together referred to herein as "Okaya."

**Taitsu**

83.     Defendant Taitsu Corporation ("Taitsu Corp.") is a Japanese corporation with its principal place of business located at 2-23-20, Kizuki, Nakahara-ku, Kawasaki, Kanagawa 211-0025, Japan.  During the Conspiracy Period, Taitsu Corp. manufactured, sold and distributed film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

84.     Defendant Taitsu America, Inc. ("Taitsu America"), a California corporation, is a wholly owned subsidiary of Taitsu Corp. with its principal place of business located at 6160 Mission Gorge Road, Suite 100, San Diego, California 92120.  During the Conspiracy Period, Taitsu America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Taitsu Corp.

85.     Defendants Taitsu Corp. and Taitsu America are together referred to herein as "Taitsu."

**Shinyei**

86.     Defendant Shinyei Kaisha ("Shinyei Kaisha") is a Japanese corporation with its principal place of business located at 77-1 Kyomachi, Chuo-ku, Kobe 651-0178, Japan. During the Conspiracy Period, Shinyei Kaisha manufactured, sold and distributed film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

87.     Defendant Shinyei Technology Co., Ltd. ("Shinyei Tech") is a Japanese corporation and a corporate affiliate of Shinyei Kaisha with its principal place of business located at 77-1 Kyomachi, Chuo-ku, Kobe 651-0178, Japan.   Until February 2011, Shinyei Tech—either directly or through its business units, subsidiaries, agents or affiliates— manufactured, sold and distributed to United States purchasers film capacitors manufactured by its own business units, subsidiaries, agents or affiliates, or those of Shinyei Kaisha.

88.     Defendant Shinyei Capacitor Co., Ltd. ("Shinyei Capacitor") is a Japanese corporation and a corporate "affiliate" of Shinyei Kaisha with its principal place of business located at Shinagawa Crystal Square 11F, 1-6-41 Konan, Minato-ku, Tokyo 108-0075, Japan. Starting in or about February 2011, Shinyei Capacitor was established by Shinyei Kaisha to take over the film capacitors business of Shinyei Tech.  After in or about February 2011, Shinyei Capacitor—either directly or through its business units, subsidiaries, agents or affiliates— manufactured, sold and distributed to United States purchasers film capacitors manufactured by its own business units, subsidiaries, agents or affiliates, or those of Shinyei Kaisha (including, without limitation, Shinyei Tech).

89.     Defendant Shinyei Corporation of America, Inc. ("Shinyei America") is a Delaware corporation and a wholly owned subsidiary of Shinyei Kaisha with its principal place

24

of business located at 1120 Avenue of the Americas, 4th Floor, New York, New York 10036. During the Conspiracy Period, Shinyei America—either directly or through its own business units, subsidiaries, agents and affiliates or those of Shinyei Kaisha—sold and distributed to United States purchasers film capacitors manufactured either directly by Shinyei Kaisha or through Shinyei's business units, subsidiaries, agents and affiliates (including, without limitation, Shinyei Capacitor and Shinyei Tech).

90.    Defendants Shinyei Kaisha, Shinyei Capacitor, and Shinyei America are together referred to herein as "Shinyei."

**Nitsuko**

91.    Defendant Nitsuko Electronics Corporation ("Nitsuko") is a Japanese corporation with its principal place of business located at 2031-1, Ogawara, Suzaka-shi, Nagano-ken, 382-0071, Japan.  During the Conspiracy Period, Nitsuko manufactured, sold and distributed film capacitors either directly or through its business units, subsidiaries and affiliates to United States purchasers.

**Nissei**

92.    Defendant Nissei Electric Co. Ltd. ("Nissei") is a Japanese corporation with its principal place of business located at 201, Motodate, Hanamaki, Iwate, 025-0061, Japan.  During the Conspiracy Period, Nissei manufactured, sold and distributed film capacitors either directly or through its business units, subsidiaries agents and affiliates to United States purchasers.

**Shizuki**

93.    Defendant Shizuki Electric Co., Ltd. ("Shizuki") is a Japanese corporation with its principal place of business located at 10-45 Taisha-cho, Nishinomiya, Hyogo 662-0867,

641354.1

Japan.    During the Conspiracy Period, Shizuki manufactured, sold and distributed film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

**Soshin**

94.    Defendant Soshin Electric Co., Ltd. ("Soshin Co.") is a Japanese corporation with its principal place of business located at 3-13-16, Mita, Minato-ku, Tokyo 108-8322, Japan.   During the Conspiracy Period, Soshin, manufactured, sold or distributed film capacitors either directly or through its business units, subsidiaries, agents and affiliates to United States purchasers.

95.    Defendant Soshin Electronics of America Inc. ("Soshin America"), a California corporation, is a wholly owned subsidiary of Soshin Co. with its principal place of business located at 2520 Mission College Boulevard #104, Santa Clara, California 95054. During the Conspiracy Period, Soshin America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Soshin Co.

96.    Defendants Soshin Co. and Soshin America are referred to collectively herein as "Soshin."

**C.    Agents and Co-Conspirators**

97.    The anticompetitive and unlawful acts alleged against the Conspirators in this Complaint were authorized, ordered or executed by their respective directors, officers, agents, employees or representatives, while actively engaged in the management, direction or control of Conspirators' businesses or affairs.

641354.1

98.     Each Conspirator acted as the principal, agent or joint venturer of or for other Conspirators with respect to the acts, violations and common course of conduct alleged in this Complaint.  Each Conspirator that is a subsidiary of a foreign parent acts as the U.S. agent for Affected Capacitors made by its parent company.   As alleged more fully below, each Conspirator headquartered outside the United States relied on its agents in the United States to carry out, enforce and conceal the cartel in the United States.

99.     Various individuals, partnerships, corporations, associations, persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance of the Conspiracy.   These co-conspirators who are not named as Defendants include, but are not limited to, TDK Corporation, TDK-EPC Corporation, TDK U.S.A. Corporation and TDK Corporation of America.

## IV.     TRADE AND COMMERCE

100.   During the Conspiracy Period, each Defendant, directly or through one or more of its parents, affiliates, subsidiaries or business units sold or delivered to U.S. purchasers aluminum, tantalum or film capacitors in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.  By way of example, the following Defendants assisted their respective corporate parent Defendants with the sale or delivery to United States purchasers of the parents' respective aluminum, tantalum or film capacitors: Hitachi Chemical America; ELNA America; Milestone (doing business as HolyStone International); Okaya America; Taitsu America; Shinyei America; and Soshin America.

101.    Conspirators engaged in illegal conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable anticompetitive effects on commerce throughout the United States.

102.    During the Conspiracy Period, Conspirators collectively controlled the markets for Affected Capacitors both globally and in the United States.

103.    The United States is a large and important market for Affected Capacitors. Sales in the U.S. account for a significant portion of Conspirators' revenues.  As such, the U.S. capacitor market was a major focus of the Conspiracy.

104.    Conspirators knowingly and intentionally sent price-fixed and bid-rigged Affected Capacitors into the stream of commerce of the United States.  Such conduct was meant to produce, and did in fact produce, a substantial harmful effect on U.S. commerce in the form of artificially high prices being paid for Affected Capacitors by U.S. customers, including Benchmark Electronics.

105.    Affected Capacitors manufactured abroad by Conspirators and sold in the United States constitute domestic or import commerce.

106.    To the extent any Affected Capacitors were purchased by Benchmark Electronics, and these purchases do not constitute domestic or import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce that gives rise to the claims asserted herein.

107.    The unlawful conduct described herein, and its anticompetitive effect on U.S. commerce, proximately caused antitrust injury to Benchmark Electronics in the United

States in the form of supracompetitive prices for Affected Capacitors, which were the natural, foreseeable and intended consequence of Defendants' anticompetitive conduct.

## V.   FACTUAL ALLEGATIONS

### A.   Background

#### (i)   What are Capacitors?

108.   Capacitors are passive electronic components that play a crucial role in electrical circuits.  Virtually every electrical circuit contains one or more capacitors.

109.   Capacitors serve as reservoirs of electric energy.  They do not require electrical power to operate; their physical properties cause them to naturally perform their function—namely to regulate the electrical current flowing through a circuit in accordance with the particular demands of the devices in which they are contained.  The amount of charge the capacitor can hold at a given voltage defines its capacitance, and capacitors ensure that the load current demands of the circuits and devices in which they are installed are met.

110.   Every capacitor consists of two or more parallel conductive metal plates, each separated from the next by a layer of non-conductive insulating material called a "dielectric."  Each plate is attached to a wire referred to as a "lead," which connects it to the rest of the circuit.

*A basic capacitor: an insulating*  *dielectric sandwiched between two metal plates.*

111.   When electric current flows into the capacitor via the leads, one plate acquires a positive charge, and the other, a negative charge, creating an electric field between

the two plates. The opposite charges attract but can never reach each other because of the dielectric that separates them, allowing the capacitor to hold its charge.

112. There are three main categories of capacitors: electrostatic, electrolytic and electrochemical. The Conspiracy affected the markets for electrolytic capacitors, specifically aluminum and tantalum capacitors (named for their conductive materials) and electrostatic capacitors, specifically film capacitors (named for their insulating materials).

**(ii)      Electrolytic Capacitors:  Aluminum and Tantalum**

113. Electrolytic capacitors are polarized, meaning that they have to be positioned in a particular direction within an electrical circuit (with the positive lead facing the positive side of the power source, and the negative lead facing the negative side). Their polarized nature gives them a higher capacitance than their electrostatic counterparts, allowing for more sophisticated applications.

114. Aluminum and tantalum capacitors, named for the metals of which they are comprised, are two of the most popular forms of electrolytic capacitors. Aluminum and tantalum capacitors were subjects of the Conspiracy.

**(iii)     Electrostatic Capacitors:  Film**

115. Electrostatic capacitors are not polarized and therefore can be installed in either direction. They have a lower capacitance than their electrolytic counterparts, but allow for stable and sustained usage at a low cost.

116. Film capacitors, which are a type of electrostatic capacitor, employ a layer of plastic film as their insulating dielectric. Film capacitors were subjects of the Conspiracy.

641354.1

## VI.   MARKET CHARACTERISTICS AND TRENDS THAT FACILITATED AND MOTIVATED THE CONSPIRACY

117.   A number of characteristics made the capacitor industry particularly prone to successful price-fixing and bid-rigging during the Conspiracy Period.  Conspirators were aware of each of the factors described below and exploited them to achieve their injurious anticompetitive ends throughout the Conspiracy Period.

### A.   Complete Commoditization

118.   In spite of their crucial functions, capacitors are commoditized products. Most are small and simple, typically costing no more than a few cents, and sometimes as little as a fraction of a cent.  Across the global market, capacitors of the same form, dielectric and capacitance produced by different manufacturers can be freely substituted for one another, rendering one brand essentially indistinguishable from any other.  Indeed, manufacturers of products incorporating capacitors often utilize several different brands of the same type of capacitor interchangeably within a single device.

119.   As Conspirators recognized prior to and throughout the Conspiracy Period, the interchangeability of different brand capacitors rendered the market especially susceptible to anticompetitive manipulation.  Pricing is the primary differential between competitors and, accordingly, the principal basis upon which purchasing decisions on Affected Capacitors are made.  Therefore, curtailing price competition, as Conspirators did here, effectively eliminated competition.

120.   Moreover, as a result of the interchangeability of their product offerings, Conspirators were able to more readily agree on uniform prices and more easily detect any Conspirator's failure to adhere to those prices.

**B.**     **Market Concentration**

121.   Together, Conspirators accounted for the majority of Affected Capacitors sales both globally and in the United States throughout the duration of the Conspiracy Period. In 2014, the final year of the Conspiracy, Conspirators collectively accounted for over 70% of Affected Capacitors sales.

122.   Given their collective domination of the Affected Capacitor market, Conspirators were able to control the overall pricing and supply of Affected Capacitors throughout the Conspiracy Period.  Non-participants did not have strong enough market power to undercut the cartel's concerted pricing and meet all or a significant part of the demand for Affected Capacitors.

**C.**     **Barriers to Entry**

123.   High barriers to entry in the capacitor market also allowed Conspirators to maintain their dominance despite charging—supracompetitive prices.

124.   The commoditized nature and low profit margins of capacitors create a landscape in which profitability depends on achieving large economies of scale.  The capacitor industry is a mature one dominated by established corporations, each having multinational operations, global market reach and diverse product portfolios of various types of passive electrical components.  Conspirators have significant experience in the global capacitor industry and established reputations with both sellers of raw materials and purchasers of finished capacitors.  They have access to significant financial resources that allow them to commit the capital necessary to bring online new fabrication operations and facilities or to expand/retrofit existing ones to meet and exceed market demand and adjust to technological changes.  This ready access to capital also permits manufacturers like the Conspirators to establish and secure

necessary supply chain commitments for all the raw materials they require.  Many Conspirators have developed internal processing capabilities for raw materials or have established relationships with raw materials producers to ensure that their requirements will be met.

125.    Before it can compete with established players like Conspirators, a new entrant in the capacitor market must invest hundreds of millions of dollars to build fabrication plants, acquire the necessary production technology, hire and retain skilled and knowledgeable manpower, secure the raw materials and supply chain commitments necessary to manufacture competitive products, and market its products to potential purchasers.

126.    No notable new manufacturers have entered the aluminum, tantalum or film capacitors industries in well over a decade, other than through strategic alliances or acquisition of companies or business units already producing specific electrolytic capacitor products (*e.g.*, Hitachi AIC's sale of its tantalum capacitor production operations to Holy Stone in 2009).

### D.    Weak Demand

127.    Conspirators were motivated by the desire to stabilize prices and maintain their investment in Affected Capacitors despite declining demand for Affected Capacitors and in the face of increasing demand for a less expensive, more malleable type of capacitor.

128.    According to a leading capacitor industry analyst, global consumption of aluminum, tantalum and film capacitors has been declining for over a decade.  Consumption of tantalum capacitors dropped from approximately 2.4% of global volume for fiscal year 2003 to an estimated 1.1% for 2014.  Consumption of aluminum capacitors dropped from approximately 10.2 % for fiscal year 2003 to an estimated 6.8% for fiscal year 2014.  Consumption of film

capacitors dropped from approximately 2.5% for fiscal year 2003 to an estimated 1.1% for fiscal year 2014.

129.   Though Affected Capacitors are used in a wide array of devices, demand for Affected Capacitors over the past decade or so has been largely tied to the demand for consumer electronics.   For instance, Nichicon's 2013 Annual Report states that the company's 21.7% decrease in capacitor sales "is attributed to declining demand for digital home electronics and inverter equipment."

130.   In particular, personal computers have historically accounted for a significant portion of global capacitor consumption, but that segment has experienced decreasing sales since the early 2000s.   Industry analysts have indicated that declining demand for these products has negatively impacted the demand for aluminum and tantalum capacitors. Aluminum and tantalum capacitors manufacturers have historically derived close to 50% of their revenues from the computer market.   A 2011 internal SANYO email states, "there is a common forecast among all companies that PC sales will be weak and the outlook is unclear."

131.   In addition, the consumer audio-video segment, which has also historically accounted for a significant portion of global capacitor consumption, has also faced significant decreasing sales over the last decade because portable music devices, tablets and smart phones have replaced them in meeting consumers' audio-visual needs.   The fall-off of the audio-visual market had a significant impact on the demand for aluminum and film capacitors.

132.   During the 2008 recession, shrinking automobile sales further diminished demand for capacitors.   MK Meeting notes state, *inter alia*, "The automotive sales in the United States were less than 1 million units in September.   It was the first since February 1993.   The conditions are very gloomy[;]" "The sales for in-vehicle applications in main markets are not

good and there is no way out in sight[;]" "Car-related business is particularly bad and sales will decrease by about 30%. . . . Conductive product sales will decrease by 40% [from the prior month]."

133.   An October 15, 2008 Competitor Trend Report created by SANYO based on a recent "JFC" (Japanese Film Capacitors) group meeting notes that film capacitor orders received by each competitor "stay low because of economic slump in North America, no positive forecast is being observed for 2009."

134.   Additionally, immediately prior to and throughout the Conspiracy Period, ceramic capacitors began to compromise Affected Capacitors sales.  Ceramic capacitors are electrostatic in nature, and utilize ceramic as their dielectrics.  The low cost and malleability of ceramic makes it a superior alternative to Affected Capacitors in many applications.  Capacitance is traditionally a function of a capacitor's surface area.  Because of ceramic's plasticity, many alternating layers of ceramic and metal can be tightly "stacked," increasing surface area and thus capacitance, without significantly growing the size of the capacitor.  The resulting products, introduced in the late 1990s, are known as "MLCCs" (multilayer ceramic capacitors).

135.   Throughout the Conspiracy Period, ceramic capacitors continued to rise in prominence, while growing cheaper and cheaper.  Currently, the price of MLCCs is, on average, only a fraction of the price of aluminum, tantalum and film capacitors, with an average per unit price of approximately $.0006.  Even the cheapest Affected Capacitors can be 100 times more expensive on a per unit basis.  A 2011 industry report circulated by Shinichi Torii of SANYO states, "Because all customers changed what they could to MLCC due to the impact of price

35

increases, demand [for manganese tantalum capacitors] decreased suddenly.  The decrease was 20 to 30% compared to last year.  It will just continue to decrease from now on too[.]"

136.   As a result, during the Conspiracy Period, many manufacturers invested the enormous time and expense required to redesign the electrical circuits in the products they produce to replace aluminum, tantalum or film capacitors with ceramic capacitors.   For example, March 11, 2009 MK Meeting Notes state that, in contrast to the prior models, Samsung's new LCD TV model would incorporate MLCC capacitors rather than tantalum capacitors "so no more orders are expected."

137.   As a result of the above market trends, producers were left with excess supply and insufficient demand for Affected Capacitors to maintain their investment.  Faced with increased requests by purchasers for price reductions, Conspirators feared that price competition would reduce, if not eliminate, profitability for Conspirators' Affected Capacitor manufacturing operations.

138.   Under normal business conditions, when confronted with weak demand conditions, firms will attempt to maintain their sales by taking market share from competitors through decreasing prices.  For this reason, firms faced with static or declining demand have a greater incentive to collude with competitors to avoid price competition and profit erosion.

139.   MK Meeting Notes from 2008 reflect the following common sentiment amongst Conspirators:  "In this situation, if we struggle to improve the business, it will cause further decrease in prices, leading to decreased profitability.  But if the production decreases, the management demands an increase in the sales in their natural course of action."

140.   In order to stabilize prices, Conspirators engaged in a combination and conspiracy to suppress and eliminate competition by fixing prices, limiting supply and rigging bids of Affected Capacitors sold in the United States and elsewhere.

E.        **Inelastic Demand**

141.   Demand inelasticity for Affected Capacitors further facilitated the Conspiracy, allowing Conspirators to raise prices to supracompetitive prices without significantly undermining sales volumes.

142.   Demand inelasticity means that price variations do not significantly impact sales volumes.   This phenomenon is experienced when a product has an important function, but has few or no practical substitutes.

143.   There are three primary categories of direct purchasers for Affected Capacitors:   1) original equipment manufacturers ("OEMs") who incorporate capacitors into their finished electronic products; (2) component manufacturers ("CMs") who manufacture and assemble circuit boards and other electric circuit products that are integrated into finished electronic products; and (3) electronic component distributors who buy capacitors for resale to OEMs and CMs.   Benchmark Electronics falls into the second category.   All of these purchasers buy Affected Capacitors in large volume, as everyday electronics may contain dozens or even hundreds of capacitors.

144.   Demand—particularly short- and medium-term demand—is inelastic for aluminum, tantalum and film capacitors.   As set forth above, capacitors are a fundamental and necessary component of a vast array of electronic products.   While different brands of like capacitors are mutually interchangeable, different forms of capacitors typically are not.   Electric circuits are designed to accommodate capacitors with specific capacitances, materials and

shapes (*i.e.*, "form factors").  Thus, even with the technological and material advancements in ceramic capacitors, a product or component manufacturer would in many instances have to redesign and re-engineer the relevant circuits of its products to accommodate a substitute— which could prove enormously expensive and time-consuming.  Although over time original equipment and component manufacturers made the investments necessary to redesign certain of their products to allow for the lower-cost ceramic capacitors, that transition did not impact the short- and medium-term demand for Affected Capacitors, which remained inelastic.  Notably, purchasers of Affected Capacitors often faced strict deadlines tied to promised product delivery dates that deprived them of meaningful choice in the face of supracompetitive prices.

145.   Further, capacitors typically account for a very small percentage of the production cost of the finished electronic devices in which they are contained.  Notwithstanding their critical functions, nearly all Affected Capacitors cost well under $1 per unit, with most costing no more than a few cents, and many costing mere fractions of a cent.  Therefore, even a significant increase in the price of Affected Capacitors would have a minimal effect on the purchase price of electrical devices.

### F.   Large Number of Purchasers With Limited Purchasing Power

146.   In the markets for aluminum, tantalum and film capacitors, Conspirators sell to a wide number of purchasers around the globe, the vast majority of which during the Conspiracy Period made up no more than 10% of each Conspirator's respective annual net sales, year over year.

147.   Conspirators were therefore able to avoid even their most valuable clients' requests for better terms, providing lockstep prices and production lead times to purchasers who tried to shop around for the best deal.  In an internal email dated December 19, 2007, Panasonic

employee, Uemura Koichi, wrote:  "Member companies are increasing their prices.  Although I am afraid our good clients will request reduction, we will not need to reduce our prices."

###### G.      Ease of Information Sharing Among Conspirators

148.    Because of their common trade associations and existing interrelationships, Conspirators had many opportunities both before and during the Conspiracy Period to discuss and exchange competitive information regarding the pricing and supply of Affected Capacitors.

149.    Various Conspirators have attended bi-annual meetings of the World Capacitors Trade Statistics program since its inception in 1986.  This program was formed for the purpose of collecting and disseminating monthly statistics on world shipments of capacitors.

150.    The World Capacitors Trade Statistics program includes Japanese, American and European trade organizations known as JEITA, ECIA and EPCIA, respectively.

151.    The Japan Electronics and Information Technology Industries Association ("JEITA") includes Defendants Fujitsu, Hitachi Chemical, Matsuo, Nichicon, Nippon Chemi-Con, NEC TOKIN, Okaya, Panasonic, ROHM, Rubycon and Soshin.  JEITA was formed in 2000 from two earlier organizations, the Electronic Industries Association of Japan and the Japan Electronic Industries Development Association, and contains a capacitor working group.

152.    The American organization, the Electronic Components Industry Association ("ECIA"), includes Defendants AVX, KEMET, Panasonic and ROHM.  According to the ECIA, its members are granted access to "industry peers and executive networking" and events where they can be "face-to-face with leaders of the authorized electronic components industry."

153.    The European organization, the European Passive Components Industry Association ("EPCIA"), provides similar networking opportunities and includes Defendants Nichicon, AVX and Panasonic.

154.    Defendants KEMET and Panasonic are also members of the Power Sources Manufacturers Association ("PSMA").    The PSMA is a co-sponsor of the yearly Applied Power Electronics Conference and Exposition ("APEC"), started in 1986, which Conspirators regularly attended.

155.    Aside from these organizations' formal gatherings, during which Conspirators were able to discuss and exchange sensitive competitive information, Conspirators also have numerous business connections between their former and current colleagues, co-venturers or partners employed by other Conspirator companies.    Key decision-makers for the major producers have both direct and indirect personal access to one another.    These relationships were also exploited to further the Conspiracy and exchange sales intelligence.

## VII.    THE CONSPIRACY

### A.    Price-Fixing, Supply Constraint, and Bid-Rigging

156.    In order to maintain the value of their investments in Affected Capacitors in the face of waning demand and deteriorating market conditions, Conspirators combined, conspired and contracted to suppress and eliminate competition for Affected Capacitors sales by fixing prices, constraining supply and rigging bids.    This occurred for the duration of the Conspiracy Period, which ranged from at least September 1997 through approximately March 2014.

157.    Conspirators charged their customers supracompetitive prices determined by agreements, understandings and exchanges of sensitive competitive information by each

Conspirator.   Conspirators' electronic communications and cartel meeting notes from throughout the Conspiracy Period include statements like:  "[C]apacitors are running short in the market and there is no better timing than now for us to raise prices." "Let's stop this meaningless competition." "That's too cheap! Put your price up!" "Let us proceed while exchanging information so that we are not taken for a ride by customers."   "Our past competition for winning market share resulted in an extremely severe situation of the industry as a whole. . . we wish to cooperate with you so that the industry will be back to life again.  We kindly ask for your continued cooperation."

158.   Conspirators exchanged information regarding fixed and variable input costs that impacted their product pricing, including raw materials costs and labor costs, sales volumes, profitability, current prices, intended future prices, production capacity, market forecasts, customer, product- and industry-specific pricing demands, and proposed responses thereto.  Conspirators provided one another with this secret business intelligence during formal cartel meetings, ad hoc meetings between subsets of Conspirators and through miscellaneous written and oral communications.  For example, a January 16, 2011 email from Shinji Takagaki to fellow SANYO employees states, "N Company has called me today, saying that they will raise the price by 30% to its major client."

159.   Conspirators monitored the prices of their fellow cartel members during the Conspiracy Period and punished those who strayed from the agreed pricing, typically through temporary exclusion from cartel meetings and other informational exchanges.  For example, SANYO's report from an August 2009 MK meeting complains that "NC's dumping which is hard to understand is noticeable so caution shall be paid.  NC, for example, lowered the PS3 price by 12% just for the several % share increase, and also submitted the quotation to

Fujitsu at half the price, etc. . . . they have a shrewd aspect to secretly develop cheaper versions and propose to customers.  At any rate, their basic strategy is to overreach others in gaining business and we need to be prepared for it to protect ourselves and to grow."

160.   In this manner, Nichicon and Nippon Chemi-Con were each excluded at times from cartel discussions regarding price fixing in the aluminum and tantalum capacitor markets.  Additionally, at times during the Conspiracy Period, "cheaters" were reprimanded during cartel meetings for pursuing their individual interests over those of the cartel by failing to adhere to the Conspirators' price-fixing agreements.

161.   In order to justify and maintain their inflated prices, Conspirators further agreed to reduce production in order to prevent excess supply from further diminishing prices.

162.   In his notes from the October 8, 2008 MK Meeting, SANYO's representative remarked that NEC TOKIN, SANYO, Rubycon, Nippon Chemi-Con, Matsuo, Fujitsu, ELNA, and Hitachi AIC commonly agreed:  "if we struggle to improve the business, it will cause further decrease in prices, leading to decreased profitability.  But if the production decreases, the management demands an increase in the sales in their natural course of action."

163.   Conspirators coordinated to quote similar or identical production lead times (elapsed time between placement of the order and delivery of the goods) to purchasers in order to manipulate the balance of supply and demand in Conspirators' favor.  This coordination permitted Conspirators to mete out the supply of their products, thereby artificially restricting supply and creating the perception of a supply shortage.

164.   Conspirators regularly attempted to justify their increased production lead times to their customers through contrived excuses like difficulties obtaining raw materials necessary for production (*e.g.*, tantalum ore and powder, aluminum foil, plastic film, dielectric

resins), labor shortages, and production and shipping delays caused by natural disasters (*e.g.*, the 2011 Tohoku earthquake and tsunami, typhoons in Asia, and flooding in Thailand and other countries where Conspirators' capacitor manufacturing facilities are located). Although some of these events may have temporarily had some genuine effect on production, the nature and extent of that impact was exaggerated by Conspirators to account for their artificially constrained supplies of Affected Capacitors and increased prices.

165. Additionally Conspirators engaged in bid-rigging so that each could "mutually secure a market share" without having to meaningfully lower its target prices. Competitors for common customers coordinated their respective bids for business in order to allocate market shares consistent with their production capacities, agreeing in advance which seller should "win" the bid and what their respective initial and final offers should be to guarantee the desired outcome.

166. For example, in an April 2009 email chain with fellow SANYO employees, Tadashi Yoshida recounts his conversations with "Company N" (NEC TOKIN) with respect to a particular Affected Capacitors deal with "HW":

> "Yesterday, I have offered the prices below to Date-san of Company N. . . . I said let's share by two companies. From HW to Company N, there is a demand for 10M/15 M and a request for TGT $0.11. I mentioned it is not necessary to go that low. Period."

167. The same email chain reveals that "Company N" and SANYO rigged bids with respect to a common customer's pricing request on two Affected Capacitors models, to result in respective market shares of 70% and 30%, which accorded with SANYO's maximum production capacity: "Initially, Company N had 100% share, but was changed to 70%, and SANYO will have 30% share. . . . I guess we may not be able to handle if we receive order for more than 30%. I will tell Company N with 10% increased price[.]"

168.   Another email between SANYO employees, dated July 30, 2009, reflects Mr. Tadashi Yoshida's collusive telephone conversation with Mr. Date of NEC TOKIN regarding Capacitor sales to a common customer:

"Situation of N Company:
Jan. to Mar.:  $0.18, Share 25 to 30%.
Apr. to Jun.:  $0.176, Share 0%.
They are going to offer $0.165 in this RFQ [request for quotation] in order to recover their share.  I explained to him that we would offer $0.1611, 3% up from $0.1564 and were not thinking about any discount this time.  He said that N-Company would recover the share at around $0.16.

169.   As a result of Conspirators' bid-rigging, customers were prevented from negotiating competitive prices for the products they purchased and were forced to pay Conspirators' collusive overcharges.

**B.      Conspiratorial Meetings**

170.   At least by 1997 and continuing throughout the Conspiracy Period, certain Conspirators attended regular and ad hoc meetings in which sensitive competitive information regarding Capacitors was exchanged and minimum prices were set.

171.   Each of these meetings constituted overt acts in furtherance of the Conspiracy.

172.   These meetings were an outgrowth of regular industry gatherings dating back to the 1980s in which the participants exchanged historical summary pricing and sales data.

173.   Based on the information disseminated and agreements reached at these different cartel meetings, the Conspirator attendees agreed to price Affected Capacitors collusively, stand united against price reduction demands, and set production and delivery dates to collusively control supply in the Affected Capacitor markets.

44

174.   Meeting rosters and notes indicate that Defendants AVX; ELNA; Fujitsu; Hitachi; Holy Stone; KEMET; Matsuo; NEC TOKIN; Nichicon; Nippon Chemi-Con; Nissei; Nitsuko; Okaya; Panasonic; ROHM; Rubycon; SANYO; Shinyei; Shizuki; Soshin; Taitsu; and TOSHIN KOGYO participated in, were informed of, and/or were discussed at the cartel's regular meetings.

175.   The participants at these cartel meetings generally represented their corporate families on the whole and did not make known to the other participants any divisions in interest between the various affiliated entities on whose behalf they appeared.

176.   All participants understood that the other participants in cartel activities entered into agreements and understandings with one another on behalf of all entities within their respective corporate enterprises.

177.   As such, participants in meetings, communications and other activities undertaken to effectuate the Conspiracy were agents of, and made commitments for, their full corporate families.

178.   This is reflected in records of meetings throughout the Conspiracy Period, which do not distinguish between entities or officers within a single corporate enterprise or corporate family.   Instead, membership rosters, reports and minutes from cartel meetings identify corporate enterprises, usually by the abbreviated name of the ultimate corporate parent (*e.g.*, "Panasonic," "SANYO," "KEMET," etc.).

179.   Certain cartel meeting participants held multiple positions with both their parent companies and the parent's subsidiaries, underscoring the fact that their conspiratorial actions were simultaneously undertaken for the benefit of various corporate affiliates.   For example:

(a)     Ippei Takeda—Nichicon Corp.'s current Chairman and CEO, and former Representative Director of Nichicon America—attended ATC meetings and was a member of the ATC President's Committee.

(b)     Zenichiro Uehara—General Manager for Soshin Co.'s Sales Department who served as both President and a Managing Director of Soshin America—attended JFC meetings.

(c)     Takehisa Okumura—General Manager and Sales Supervisor of Shinyei Tech, who served as both President and Chairman of the Board of Shinyei America—also attended JFC meetings.

180.   Nippon Chemi-Con, Rubycon, Hitachi, Fujitsu, Panasonic/SANYO, Nichicon, and Matsuo each played a key role in organizing the cartel's regular meetings and coordinating the operation of the cartel during the Conspiracy Period.   Each of these Conspirators manufactured both electrolytic capacitors (*i.e.*, aluminum and/or tantalum) and film capacitors and had global presence in the Affected Capacitor markets.   Nippon Chemi-Con, Rubycon, Hitachi, Fujitsu and Panasonic/SANYO regularly attended cartel meetings where attendees fixed prices for both electrolytic and film capacitors.   Nichicon and Matsuo regularly attended cartel meetings where attendees fixed prices for electrolytic capacitors and were "associate members" of a group of companies that met regularly to fix prices for film capacitors. This overlap of membership between the electrolytic and film capacitors groups allowed the Conspirators involved in the cartel to integrate and coordinate their collusive efforts.

181.   The participant rosters would occasionally change when cartel members agreed to exclude from the meetings, at least for a time, certain Conspirators that were suspected of cheating on the cartel through using the competitively sensitive information they

received through the cartel's operation for their own individual benefit (*e.g.*, Nippon Chemi-Con).

182.   Cartel meetings took various forms and were known by various names throughout the Conspiracy Period.

183.   Between 1999 and 2003, various Conspirators—including SANYO, Nichicon, ELNA, Nippon Chemi-Con, and Rubycon—attended periodic regional group meetings, including the KCC Meetings (regarding sales in the Kangai region of Japan), and Hananoki meetings (regarding sales in the Hananoki region of Japan).  During these meetings, sales and production statistics and sensitive market information were shared.

184.   "ECC" (Electrolytic Capacitor Company) Meetings also occurred regularly throughout this period.  There were two types of ECC Meetings:  monthly meetings that were attended by managerial-level employees and biannual meetings attended by upper-level executives.  SANYO, Panasonic, Nichicon, ELNA, Rubycon, and Nippon Chemi-Con regularly attended these ECC Meetings.

185.   ECC Meetings included discussions about individual and collective pricing of aluminum capacitors.  Members would complain if other members were pricing their products too low.

186.   The Foreign Trade Committee of the ECC discussed overseas business, including pricing for those markets.  Attendees of the Committee meetings agreed to restrain trade on a global basis, including with respect to U.S. sales.

187.   "TC" (Tantalum Capacitors) Meetings were held from at least 2001-2003. These meetings also involved pricing discussions and the exchange of sensitive competitive information.

188.    An organizational chart produced by Panasonic reflects Chair Companies and Audit Companies for the TC Meetings as follows:

| Fiscal Year | Chair Company | Audit Company |
| --- | --- | --- |
| 2001 | NEC Tokin Corporation | Sanyo Electronic Components Co., Ltd |
| 2002 | Matsuo Electric Co., Ltd. | Elna Co., Ltd |
| 2003 | Nichicon Corporation | Nippin Chemi-Con Corporation |
| 2004 | Hitachi AIC Inc. | Fujitsu Media Devices Ltd. |
| 2005 | NEC Tokin Corporation | Rohm |
| 2006 | Matsuo Electric Co., Ltd. | Sanyo Electronic Components Co., Ltd |
| 2007 | Nichicon Corporation | Elna Co., Ltd |

The 2002 TC Meeting Trade Committee Roster reflects the same members.

189.    In 2003, the ECC and TC Meetings were combined, resulting in regular "ATC" (Aluminum Tantalum Capacitors") meetings.

190.    An ATC Meeting Members Roster as of July 16, 2003 lists ELNA, Matsuo, NEC TOKIN, Hitachi, Fujitsu, Panasonic, Rohm, Nichicon, Nippon Chemi-Con, Rubycon and SANYO.  An ATC Meeting President Committee Roster as of the same date lists the same companies.

191.    In 2005, the ATC Meetings were renamed the "MK" (Marketing) or Market Study Group Meetings.  These ATC/MK Meetings were held periodically through at least 2010.

192.    Monthly ATC/MK Meetings were attended by manager-level employees of various Conspirators—including Panasonic, SANYO, NEC TOKIN, ELNA, Nippon Chemi-Con, Nichicon, Rubycon, Fujitsu, Matsuo and Hitachi.  These meetings focused on the

48

exchange of competitively sensitive data, such as production and sales volumes, current and future excess capacity, current and future pricing, raw material pricing and access issues, as well as various other statistics. Representatives of each Conspirator in attendance would make a presentation regarding his company's sales situation.

193. Biannual ATC/MK meetings were attended by Conspirators' high-level executives. During these meetings, each company's executive would give a formal presentation regarding the current market landscape for their products, complete with current and historical sales performance and profitability data for both Japanese and overseas markets (including the U.S.), current customer requests, industry trends, and future pricing and production intentions for aluminum and tantalum capacitors. During these meetings, participants would frequently recommend inflated prices to be implemented by the other cartel members.

194. During these meetings, Conspirators also discussed and agreed on the uniform denial of customers' price reduction requests, and how such denials should be handled and justified, as well as the uniform prices to be charged.

195. An "Overseas Trade Sectional Meeting" of the "ATC Group" was formed at least as early as 2003. The attendees at these meetings discussed sales of aluminum and tantalum capacitors in non-Japanese markets (*i.e.*, including the United States), and prices were mutually agreed upon among the participants. At a minimum, representatives from NEC TOKIN, ELNA, Panasonic, Nippon Chemi-Con, Nichicon, Rubycon, Fujitsu, Matsuo, SANYO, and Hitachi participated in the "Overseas Trade Sectional Meeting" discussions.

196. Meeting minutes from the August 31, 2003 joint session of the Overseas Trade Sectional Meeting of the ATC Group provided the following mission statement: "The

purpose of the meeting is to exchange information by market and by capacitor category so that each company will be able to enjoy profits and that healthy market prices will be maintained."

197.   These same minutes reflect specific discussions of U.S. sales, noting the stagnation of ELNA's U.S. business, but also noting that "GM is enjoying brisk sales (Business circumstances vary among Big 3)."

198.   From at least 2007 to at least 2009, various Conspirators also attended "JFC" (Japanese Film Capacitors) meetings every few months.

199.   During these meetings, individual pricing and profits data regarding film capacitors was shared and participants agreed on concerted price increases.

200.   A 2008 JFC Membership List produced by Panasonic reflects the following members:   Okaya, Shinyei, Soshin, Taitsu, TOSHIN KOGYO, Nissei, Nitsuko, Nippon Chemi-Con, Hitachi, Panasonic and Rubycon (noted to be a member at that time "only in terms of data").

201.   Specific examples of collusive activity that occurred at the regular group meetings include:

(a)     May 13-14, 1999 ECC Meeting:   Executives from at least SANYO, Nichicon, Nippon Chemi-Con, Hitachi, ELNA and Nitsuko attended.   Conspirator attendees shared detailed information regarding their production, sales and profits for Affected Capacitors.   SANYO urged Nippon Chemi-Con to refuse to accommodate customers' solicitations for low cost orders and "asked them to sell the products maintaining the price and they said 'Of course.'"

(b)     Representatives from at least Nitsuko, Nichicon, Fujitsu, Rubycon, Taitsu, TOSHIN KOGYO, Shizuki, Hitachi, Soshin, Shinyei and SANYO attended cartel

50

meetings held during the 3rd Quarter of 2002.  At the meetings, Conspirator attendees discussed, among other things, demand for film capacitors in the United States, and exchanged competitively sensitive, non-public information concerning volumes of sales and shipments for products that used film capacitors.

(c)     Representatives from at least Nitsuko, Soshin, Nippon Chemi-Con, Panasonic, Nichicon, Fujitsu, Shizuki, TOSHIN KOGYO, Okaya, Hitachi, NEC TOKIN and SANYO attended cartel meetings held during the 4th Quarter of 2002.  At these meetings, Conspirator attendees discussed, among other things, specific Conspirators' recent and historical pricing for tantalum capacitors and their strategies regarding price increases.

(d)     Representatives from at least Nitsuko, Soshin, Fujitsu, Rubycon, Nippon Chemi-Con, Nichicon, TOSHIN KOGYO, Shizuki, Taitsu, Nissei and Hitachi attended cartel meetings held during the 1st Quarter of 2003.  At these meetings, Conspirator attendees discussed, among other things, business conditions in the United States, and competitively sensitive, non-public information concerning demand for film and electrolytic capacitors.

(e)     Representatives from at least Nitsuko, Soshin, Taitsu, Nissei, Panasonic, TOSHIN KOGYO, Nippon Chemi-Con, Fujitsu, Shizuki and Hitachi attended cartel meetings held during the 2nd Quarter of 2003.  At these meetings, Conspirator attendees discussed, among other things, the volumes of film capacitors they had shipped and the prices per unit, and anticipated increases in Affected Capacitor prices.

(f)     Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Hitachi, Nichicon, Rubycon, ELNA and Matsuo attended cartel meetings held during the 3rd Quarter of 2003.  At these meetings, Conspirator attendees discussed, among

51

other things, their common goals to maintain high prices for Affected Capacitors and prices of Affected Capacitors for U.S. automotive manufacturers.

(g)     Representatives from at least Panasonic, Hitachi, Nissei, Soshin, Taitsu, Nitsuko, Fujitsu, TOSHIN KOGYO, Shinyei, SANYO, Nippon Chemi-Con, and Nichicon attended cartel meetings held during the 2nd Quarter of 2004.  At these meetings, Conspirator attendees discussed, among other things, specific Conspirators' anticipated price increases to export customers.

(h)     Representatives from at least Taitsu, TOSHIN KOGYO, Nissei, Nitsuko, Panasonic, Fujitsu, SANYO, Nippon Chemi-Con and Hitachi attended cartel meetings held during the 4th Quarter of 2004.  At these meetings, Conspirator attendees discussed, among other things, overseas conditions for the film capacitor market.

(i)     Representatives from at least SANYO, Hitachi, Rubycon, Fujitsu, ELNA, Matsuo, Taitsu, Panasonic, Nippon Chemi-Con, Nissei, Nitsuko, Soshin, TOSHIN KOGYO and Shinyei attended cartel meetings held during the 2nd Quarter of 2005.  At these meetings, Conspirator attendees discussed, among other things, certain Conspirators' refusal to lower prices in response to a request from large customers.

(j)     Representatives from at least Nissei, Nitsuko, Soshin, Panasonic, Nippon Chemi-Con, Taitsu, TOSHIN KOGYO, Shinyei, Hitachi, Nichicon, Rubycon, Matsuo and SANYO attended cartel meetings held during the 3rd Quarter of 2005.  At these meetings, Conspirator attendees discussed, among other things, coordinating pricing for Affected Capacitors in the 3rd and 4th Quarters of 2005.

(k)     Representatives from at least SANYO, Nippon Chemi-Con, ELNA and Matsuo attended cartel meetings held during the 4th Quarter of 2005.  At these meetings,

Conspirator attendees discussed, among other things, coordinating their activities at the highest levels through regular meetings of senior officials in charge of Affected Capacitors sales.

(l)      Representatives from at least Panasonic, Hitachi, TOSHIN KOGYO, Okaya, Taitsu, Shinyei, Nitsuko, Nissei and Soshin attended cartel meetings held during the 1st Quarter of 2006.  At these meetings, Conspirator attendees discussed, among other things, market conditions, pricing intentions, plans with respect to entering or not entering specific market sectors and information shared at trade association meetings.

(m)      Representatives from at least SANYO, Nippon Chemi-Con, Hitachi, ELNA and Matsuo attended cartel meetings held during the 2nd Quarter of 2006.  At these meetings, Conspirator attendees discussed, among other things, coordinating their activities at the highest levels through regular meetings of senior officials in charge of Affected Capacitors sales.

(n)      Representatives from at least SANYO, Nippon Chemi-Con, ELNA, and Matsuo attended cartel meetings held during the 3rd Quarter of 2006.  At these meetings, Conspirator attendees discussed, among other things, coordinating their activities at the highest levels through regular meetings of senior officials in charge of Affected Capacitors sales.

(o)      Representatives from at least Okaya, Panasonic, Taitsu, Nissei, Hitachi, Nippon Chemi-Con, Soshin, SANYO, ELNA and Matsuo attended cartel meetings held during the 4th Quarter of 2006.  At these meetings, Conspirator attendees discussed, among other things, domestic and global capacitor market share and conditions.

(p)      Representatives from at least SANYO, Nippon Chemi-Con, ELNA, Matsuo, Rubycon, Okaya, Soshin, Taitsu, Nissei, Nitsuko, Hitachi, Panasonic, Shinyei

and TOSHIN KOGYO attended cartel meetings held during the 2nd Quarter of 2007.  At these meetings, Conspirator attendees discussed, among other things, market conditions for film capacitors by appliance.

(q)      Representatives from at least SANYO, NEC TOKIN, Rubycon, Matsuo, Panasonic, Nissei, Nippon Chemi-Con, Nitsuko, Hitachi, Soshin, TOSHIN KOGYO and Shinyei attended cartel meetings held during the 3rd Quarter of 2007.  At these meetings, Conspirator attendees discussed, among other things, the cartel's agreement to increase prices.

(r)      Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Rubycon, ELNA, Panasonic, Taitsu, Nitsuko, Okaya, Hitachi, Soshin, TOSHIN KOGYO, Shinyei and Nissei attended cartel meetings held during the 4th Quarter of 2007. At these meetings, Conspirator attendees discussed, among other things, their plans to increase film capacitor prices, despite customer requests for price reductions. The Conspirator attendees also discussed specific pricing intentions regarding specific customers.

(s)      Representatives from at least TOSHIN KOGYO, Hitachi, Soshin, Nitsuko, Nissei, Okaya, Taitsu and Shinyei attended cartel meetings held during the 2nd Quarter of 2008.  At these meetings, Conspirator attendees discussed, among other things, customer pricing, including implementing price hikes and non-Japan market conditions.  Specifically, certain of the Conspirator attendees agreed to stabilize prices and resist customer efforts to request price reductions.

(t)      Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Matsuo, Rubycon, ELNA and Hitachi attended a MK meeting on July 10, 2008. Conspirator attendees discussed their companies' Affected Capacitors production and sales statistics and current and future pricing information, as well as market and product trends

affecting production costs and demand.  The participants agreed to collective price increases for ECAP manganese tantalum capacitors.  SANYO's representative at that meeting also noted in his summary, "A request for cooperation has been made in relation to price of, and the mark-up (differences between the domestic and international prices) of halogen-compatible ECAP/OS-CON [aluminum capacitors]."  The meeting notes also state, "NCC wants to go along with SANYO.  It is necessary to consider how we should get along with it."

(u)     Representatives from at least Panasonic, Nissei, Okaya, Taitsu, Shinyei, Hitachi, Soshin, Rubycon and Nippon Chemi-Con attended a JFC Meeting on September 16, 2008.  At the meeting, Conspirator attendees discussed sales and production trends and data and status reports regarding price hike negotiations with customers of film capacitors.  A SANYO report entitled "Movements of Other Companies," which details the sensitive competitive information exchanged at this meeting, states in part, "[w]e decided to accept the film price hike effective on April 1."

(v)     Representatives from at least SANYO, NEC TOKIN, Rubycon, Nippon Chemi-Con, Matsuo, Fujitsu, ELNA and Hitachi attended a MK Meeting on October 8, 2008.  Conspirator attendees presented their respective Affected Capacitors sales data and agreed that the market conditions were poor and sales would significantly decrease in the remainder of the year.  Firms agreed that struggling to improve their businesses would only cause further decreases in prices and profitability, but that constraining supply of Affected Capacitors would allow them to demand higher prices.  Downward sales forecasts for North America were specifically discussed.

(w)     Representatives from at least Nissei, Panasonic, Taitsu, Shinyei, Rubycon, Okaya, Soshin, NEC TOKIN, Nippon Chemi-Con, Matsuo, Fujitsu, ELNA, Hitachi

and SANYO attended cartel meetings during the 4th Quarter of 2008. At these meetings, Conspirator attendees discussed, among other things, implementing film capacitor price increases, current production status, market conditions in foreign markets, including North America, and ending price competition on film capacitors.

(x)     Representatives from at least Okaya, TOSHIN KOGYO, Nissei, Nippon Chemi-Con, Nitsuko, Shinyei, Soshin and Taitsu attended a JFC Meeting on February 13, 2009. At this meeting, Conspirator attendees exchanged sensitive sales and profits data and discussed future pricing intentions.

(y)     Representatives from at least SANYO, Nichicon, Rubycon, Matsuo, ELNA, Fujitsu, Hitachi and Company "NC," (Nippon Chemi-Con) attended a MK Meeting in April 2009. Conspirator attendees discussed product and industry specific demand levels. In particular, participants discussed current demand levels for Affected Capacitors in the United States, including as a function of the performance of major U.S. automobile manufacturers ("Car-related demand may fall in and after May if things do not go well for the Big Three of the United States"). "NC" reported that the "decrease in demand in the U.S. market is now narrowing."

(z)     Management executives from at least SANYO, Rubycon, Matsuo, ELNA, NEC TOKIN, Nippon Chemi-Con and Hitachi attended a MK Meeting in May 2009. Conspirator attendees discussed their companies' respective production and demand levels and diminishing MLCC prices. Participants noted that business in the U.S., "where demand arises principally for industrial machinery, equipment, and cars" was "in a slump."

(aa)     Representatives from at least SANYO, Rubycon, Matsuo, ELNA, Hitachi and Companies "N" and "NC" (NEC TOKIN and Nippon Chemi-Con) attended a MK

Meeting in June 2009.  Conspirator attendees discussed widespread under-supply of aluminum capacitors as a result of their concerted supply constraint.  Rubycon noted that it was busy only as a result of overseas orders.

(bb)    Representatives from at least SANYO, Rubycon, Matsuo, Hitachi, and ELNA and NEC TOKIN attended a MK Meeting in July 2009.  Conspirator attendees discussed individual current and anticipated sales volumes and pricing structures and corrections. Rubycon noted that it still enjoyed brisk overseas demand.

(cc)    Representatives from at least SANYO, Rubycon, ELNA, NEC TOKIN and Nippon Chemi-Con attended a MK Meeting in August 2009.  Conspirator attendees discussed collectively maintaining E CAP production at 70% of each company's capacity, which had effectively reversed the supply-demand imbalance, allowing Conspirators to continue to "choose or reject each order" as "all manufacturers have order backlogs" and the "demand-supply situation [was]  tight."  Participants chastised Nippon Chemi-Con for cheating on applicable price-fixing agreements.  SANYO's meeting report states,

> [i]n recent days we have often noticed inexplicably low prices offered by NC also in conductive AL.  So we must be careful.  We keenly feel that NC's sales personnel are poorly informed or incompetent seeing they cut their PS3 price by as much as 12% to increase their share by several percent, or offer a 50% discount to Fujitsu.  At the same time, we have seen that NC is clever enough to covertly develop and offer a new cheap series.  All the above indicates that NC has a clear basic policy of outwitting competitors.  So we are required to gain market share coping with such a business manner adopted by NC.

(dd)    Representatives from at least SANYO, Rubycon, ELNA, Matsuo, Hitachi, NEC TOKIN and Nippon Chemi-Con attended a MK Meeting in September 2009. Conspirator attendees discussed "price recovery activities" for combatting the strong yen and high crude oil prices.  As usual, participants also exchanged sensitive competitive information

pertaining to their respective pricing, demand and profitability.  Rubycon noted that it would push "price recovery negotiations" for "US $ basis customers."

(ee)	Representatives from at least SANYO, NEC TOKIN, Rubycon, Nippon Chemi-Con, Matsuo, ELNA and Hitachi attended a MK Meeting in October 2009. Conspirator attendees discussed their current pricing, profitability and sales trends in particular industries and markets, including the United States.  Company "N" (NEC TOKIN) noted that it had "[a]lready raised prices by 150% [on manganese tantalum capacitors], and it came to a profitable level price-wise."  Company "NC" (Nippon Chemi-Con) stated that the US market was "in a trend of upward adjustments on every prospect review. . . . for U.S. automotives, short delivery period back orders are stacking up."  ELNA reported that its ECAP aluminum capacitors sales "[f]or U.S. automotives" were "in a situation of being transported by air through Fedex every week."

(ff)	Representatives from at least SANYO, NEC TOKIN, Rubycon, Nippon Chemi-Con, Matsuo, ELNA and Hitachi attended a MK meeting in November 2009. SANYO's meeting summary states, "[a]lthough all companies are in a good atmosphere in terms of order reception, profit hasn't been made due to the effects of exchange rates.  Price increase has been on the topic.  There is intention for increasing prices of aluminum polymer (rolled-up type) but no such talk on tantalum polymer."  Company "NC" (Nippon Chemi-Con) reported that it was "conducting negotiations for price increase mainly with overseas customers." Participants exchanged sensitive competitive information regarding current and future pricing for various aluminum and tantalum capacitor models.

(gg)	Representatives from at least SANYO, NEC TOKIN, Matsuo, ELNA and Hitachi attended a MK Meeting in January 2010.  The Conspirator attendees

exchanged sensitive information regarding pricing and profitability and reported high orders across the board.  Conspirator attendees noted the continuing "tight supply-and-demand" for manganese tantalum capacitors, but noted declining demand for other Capacitors as a result of MLCCs.  Hitachi reported on upcoming acquisition of its tantalum and niobium business by Holy Stone.

(hh)    Representatives of at least NEC TOKIN, Nippon Chemi-Con, Rubycon, Matsuo, ELNA, ROHM, Holy Stone, Okaya, Taitsu, Nissei, TOSHIN KOGYO, Shinyei and Nissei attended cartel meetings held in the 2nd Quarter of 2010.  At these meetings, Conspirator attendees discussed, among other things, their current sales data, current pricing information, industry and specific customer demands and trends, capacity, future Affected Capacitors production intentions and costs of raw materials.

(ii)    Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Rubycon, ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO and Shinyei attended cartel meetings held in the 3rd Quarter of 2010.  At these meetings, Conspirator attendees discussed, among other things, drastic price increases in prices of Affected Capacitors.

(jj)    Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Rubycon, ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO and Shinyei attended cartel meetings held in the 4th Quarter of 2010.  At these meetings, Conspirator attendees discussed, among other things, large increases in the prices of film capacitors, and refusing to do business with customers who did not accept the increase.

(kk)    Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Rubycon, ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO and Shinyei attended cartel meetings held in the 1st Quarter of 2011.  At these meetings, Conspirator attendees

59

discussed, among other things, industry trends, information shared at JEITA meetings, and coordinating their activities at the highest levels through regular meetings of senior officials in charge of Affected Capacitors sales.

(ll)    Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Rubycon, ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO and Shinyei attended cartel meetings held in the 2nd Quarter of 2011.  At these meetings, Conspirator attendees discussed, among other things, implementing price increases.

(mm)  Representatives from at least Okaya, Nippon Chemi-Con, Taitsu, TOSHIN KOGYO and Shinyei attended cartel meetings held in the 3rd Quarter of 2011.  At these meetings, Conspirator attendees discussed, among other things, order flow for film and aluminum capacitors, and price increases imposed for film capacitors used in televisions.

(nn)    Representatives from Okaya, Nippon Chemi-Con, Taitsu, TOSHIN KOGYO, Shinyei, Nissei and Nitsuko attended cartel meetings held in the 4th Quarter of 2011. At these meetings, Conspirator attendees discussed, among other things, profits obtained due to higher prices imposed over the last year, and vowed to each other to not cut prices despite competition from Taiwanese and Korean capacitor manufacturers.

(oo)    Representatives from at least Okaya, Hitachi, Nippon Chemi-Con, Nissei, Taitsu, TOSHIN KOGYO, Shinyei and Soshin attended cartel meetings held in the 1st Quarter of 2012.  At these meetings, Conspirator attendees discussed proposed increases in prices of film capacitors, and demand for products that utilize film and aluminum capacitors.

202.    Throughout the Conspiracy Period, smaller meetings were held on an ad hoc basis among subsets of Conspirators with common customers.  These meetings often

occurred when a customer was asking for a price reduction.  The company with the largest share for that customer would invite its competitors to determine a satisfactory price.

203.   For example, NEC TOKIN and SANYO often participated in bilateral discussions regarding a model of tantalum capacitor known as POSCAP with respect to shared customers, including Sony, Toshiba, Pioneer and other major electronics manufacturers.   In connection with these discussions, the competitors shared monthly production and sales statistics, exchanged intended bid amounts and plotted to resist customers' demands for price reductions.

204.   The full universe of information regarding all of the cartel meetings held in furtherance of the Conspiracy, including the dates of the meetings, the identities of the participants, the topics discussed and the agreements reached (and by whom) is in the exclusive possession of the Conspirators.  However, there are specific examples of the smaller, ad hoc meetings that involved two or more of the Conspirators.

**C.**      **AVX's Meetings and Communications with Other Defendants**

205.   During the Conspiracy Period, AVX executives met and conducted information exchanges with SANYO, KEMET, NEC TOKIN, as well as other Conspirators, about their respective Capacitors businesses and market conditions and circumstances and worked to coordinate pricing strategy among its competitors.

206.   In or about December 2009, two U.K.-based AVX representatives—Peter Collis (Vice President, AVX's Tantalum Capacitors Division) and William Millman (Technical and Quality Control Director, AVX's Tantalum Capacitors Division)—requested a meeting in Hong Kong with representatives from SANYO—Hiroya Nishimoto (Capacitor Business Unit Technical Department) and Teruyoshi Izumimoto (General Manager, Sales Department).

61

Messrs. Nishimoto and Izumimoto were participants in other cartel activities and were aware of the participation of other corporate enterprises in cartel activity. The stated purpose of this meeting between SANYO and AVX was to "exchange information about capacitors business status and market circumstances." At this meeting, AVX's representatives discussed and exchanged detailed and specific non-public confidential information with SANYO's representatives regarding customer orders and requirements, volume of sales, production lead times, production capacity, market share and allocations, strategies for withholding tantalum capacitors from the market to increase demand, availability of and sources for tantalum powder and price increases on tantalum capacitors. At the conclusion of the meeting, both of AVX's representatives indicated to SANYO's representatives that "they would like to continue this type of meeting in the future."

207. The specificity of the information exchanged between SANYO and AVX was extraordinary. SANYO told AVX that its "current production is at about 120 million pieces per month, with capacity around 90%." AVX in turn informed SANYO that "[w]e are producing 45 million pieces of polymer per month and 400 million pieces of general tantalum per month." AVX further apprised SANYO that it did not intend to increase its capacity. "There is no need for capacity increase. We can sell as much as we can make. We just sit back and wait for business."

208. With respect to market conditions, production lead times and pricing strategies, the information exchanged between SANYO and AVX was just as detailed. For example, according to Mr. Nishimoto's notes of the meeting, AVX told Sanyo that "[t]he market has returned to its normal condition. Delivery lead time is currently 26 weeks. Asia is positioned to serve as a buffer. When the market starts to slow, AVX will ship more capacitors,

62

and on the contrary, when the products become tight, they control the shipment and find buyers willing to pay higher prices."

209.   Mr. Nishimoto also reported on SANYO's discussions with AVX regarding costs and pricing.  He stated that he told AVX that "price increases would lead the tantalum capacitor industry to shrink," but that AVX "denied the possibility.  In fact, AVX said they had increased their prices by 50% for automotive applications in concert with KEMET (though their customers are complaining)."   Mr. Nishimoto also stated that AVX "boasted of the tantalum capacitor section being the biggest profit center in Kyocera AVX."  The notes further describe SANYO's impression of AVX's comments: "They do not believe that price increases to some degree after the control is put in place will allow the industry to shrink."

210.   Mr. Nishimoto obviously was aware of the anticompetitive effect and impropriety of the exchange of non-public sensitive and confidential information between SANYO and AVX.   In an internal email he sent the day following SANYO's meeting with AVX, he cautioned his colleagues at SANYO "[p]lease refrain yourselves from forwarding the AVX section of the report."

211.   In or about May 2010, SANYO's Mr. Nishimoto, along with his colleague Takeshi Funato, had a follow-up meeting with AVX's Mr. Collis in Kyoto, Japan.  At this meeting, SANYO's representatives and Mr. Collis again exchanged specific non-public, confidential information concerning production and capacity as well as raw material availability and product pricing.  "Company A's solid Cap (Ordinary Ta, Polymer Ta, NbO are all included) production is 410kk pcs/month.  Of those, Polymer Ta is at 40kk pcs per month and NbO is at 40kk pcs per month.  Sales are US$ 80 kk per year from Polymer Ta and 70 kk per year from NbO."  They also discussed plans to limit production in order to raise Capacitors prices.  Mr.

Nisihimoto wrote that '[i]t seems that in order to raise prices, it is estimated that production will not become large.  Therefore, a policy of not increasing production capacity is adopted (In order to pursue profits).  Company A's [AVX] profit is within top 3 rankings among the group companies of the parent company K [Kyocera]."

212.   Here as well, Mr. Nishimoto recognized the anticompetitive, improper nature of SANYO's confidential information exchange with AVX.  He cautioned the recipients of his internal email "[p]lease make consideration when you have this email message forwarded.  If possible, I would appreciate it if you could tell me whom you forwarded this email.  Although I am using initials for names, but many company names are appearing and contents are very sensitive.  Indeed, please handle this email with extra care."

213.   Evidence of anticompetitive information exchanged by cartel members show that AVX participated in additional exchanges with cartel members.

214.   For example, SANYO's Tadashi Yoshida indicated in his notes dated August 5, 2008 that NEC TOKIN "confirmed price increase of Tan Tal AVX/Kemet in the market."

215.   An email from SANYO's Shinichi Torrii, dated August 24, 2009, discussing presentations and discussions among cartel members, stated that "[b]ecause of the effect of reduced production at AVX, KEMET, and N-CON [either NCC or Nichicon], . . .  the company [Company N] continues to receive orders despite the third round of its price hike."

216.   An email from SANYO's Akio Nakagawa, dated August 25, 2009, contained reports on AVX and KEMET's non-public and confidential Capacitors business activities in a discussion sensitive enough for him to advise recipients, "Please be sure that you are prohibited from printing this email!!"

64

217.   Notes of an internal discussion at SANYO on or about August 11, 2010 among four of the company's employees involved in cartel activity—Messrs. Torii, Yoshida, Izumimoto and Yoshikawa—stated that, with regard to tantalum raw materials, "the increased price does not reduce the volume of order entries . . . because AVX, KEMET, Nichicon etc. have slashed the significant volume of supply (about 100 million pieces down?)."

218.   Similarly, another internal SANYO email from Shinichi Torii from on or about August 11, 2010 remarked: "Although manganese products have passed their peak, there is still insufficient supply and orders will not decrease even if prices are increased. There is still insufficient supply due to the significantly reduced supply of KEMET and AVX, etc."

**D.      KEMET's Meetings and Communications with Other Defendants**

219.   Evidence of anticompetitive information exchanged by cartel members indicates that KEMET participated in such exchanges at least as early as 2005.  Minutes of a May 27, 2005, meeting between SANYO and others report KEMET sales and production figures under the heading "exchange of information on each company's production status."

220.   In an internal email dated July 21, 2006 under the "Subject: Kemet," Shinji Takagaki of SANYO wrote "[i]t is important to expand the market, and exchanging information is useful for that.  However, it may become a double-edged sword at times." Referring to Edward Chen of KEMET, Mr. Takagi went on to say "[t]o the extent possible, try to exchange verbally so that no evidence is left behind. Especially, pricing figures and important presentation materials.  Because Edward-san is a somewhat suspicious person."

221.   Later in 2006, SANYO's internal emails reflect a more direct involvement by KEMET in the Conspiracy.  In a November 14, 2006 internal email, Soichiro Makayama discussed the need to include KEMET as part of a "family" with regard to TPL capacitors

because of a U.S. customer's preference to have four separate suppliers.  "So it is important to form a family after all.  How is the progress of collusive work with Neo or KEMET?"  A week later, SANYO had a meeting with KEMET specifically to discuss the "family-building TPL" proposal.

222.   A presentation prepared by KEMET for a February 6, 2007, meeting with NEC TOKIN in Tokyo, Japan includes slides titled "Foundation of Collaboration" and "Opportunities to Collaborate."  The presentation, which included comments from NEC TOKIN personnel, addressed NEC TOKIN's proposal to build a three-way partnership with KEMET, NEC TOKIN, and Nippon Chemi-Con as to proadlizers (a type of capacitor), as well as a proposed partnership between NEC and KEMET as to small case size polymer tantalum capacitors.

223.   An internal NEC TOKIN email dated February 13, 2007, forwards to its recipients the minutes of its February 6, 2007 meeting with KEMET, and the author requests that the recipients "destroy [the email] after reading the report."

224.   SANYO's Tadashi Yoshida indicated in his notes dated August 5, 2008 that NEC TOKIN "confirmed price increase of Tan Tal AVX/Kemet in the market."  Mr. Yoshida reported further that KEMET "will not lower but will not raise either for big companies (Polymer)."

225.   A SANYO Competitor Trend Report dated October 15, 2008 and based on information provided at a recent JFC Meeting reflects that Nissei raised its prices for the Taiwanese market "at the request of KEMET (who bought Alco)."

226.   Internal notes from SANYO discussed SANYO's June 2009 meeting with KEMET at its Headquarters in Greenville, South Carolina, where senior representatives from

66

the companies exchanged a wide array of detailed production, market and technological information involving tantalum, aluminum and film capacitors.  SANYO told KEMET that SANYO "took a long time to develop the three-terminal product market and that Sanyo did not want to, or want them to, destroy the market through the price competition."  SANYO and KEMET discussed specific pricing to customers, and SANYO complained that "we heard that company K offered an extremely low price to company A."  KEMET's representatives "insisted that KEMET did not have a low price policy," and said that they would check on the issue and "get back to" SANYO about it.

227.    SANYO notes of a December 2009 meeting with AVX reflect that an AVX representative stated that the company once raised the prices of in-vehicle tantalum capacitors products by 50 percent "in concert with KEMET (though their customers are complaining)."

228.    A February 23, 2010 summary of SANYO "Information Exchange" with NEC TOKIN states that "KEMET is currently at full capacity (60M/M)."

229.    An April 13, 2010 internal SANYO email lists the production capacities of a number of cartel members, including SANYO, Panasonic, NEC TOKIN, Nippon Chemi-Con, AVX and KEMET.

230.    In his August 2010 internal email under the Subject Line "Report on Business Trip to Taiwanese NB Manufacturer and Request for Price Hike, SANYO's Sinichi Torii discussed that "the current July's request for the price hike of general-purpose tantalum is the fifth one; +10%, +10%, +15%, +25% and (Now July), and the price hikes have been smoothly implemented."  He explained that "[t]he peak period has gone away, but since the supply is still short, the increased price does not reduce the volume of order entries.  It is

because AVX, KEMET, Nichicon, etc. have slashed the significant volume of supply (about 100 million pieces down?)."

231.   An internal SANYO report in May 2012 market conditions and "circumstances of other companies" reports that KEMET "planned to increase production 30M/M from October in Suzhou to have a 90 M/M system."

**E.**   **Defendants' U.S.-Based Subsidiaries Marketed, Sold, and Delivered Their Parents' Price-Fixed Capacitors in Furtherance of the Conspiracy's Purpose**

232.   When Conspirators reached agreements to fix, raise, maintain or stabilize prices, or constrain supply of Affected Capacitors—whether as a result of formal or informal cartel meetings, ad hoc bilateral or multilateral meetings, or through other communications— they intended for their collusive agreements to impact the pricing and supply for all Affected Capacitors, including those sold in the United Sates.

233.   Each Defendant sold its capacitors around the world, including to direct purchasers in the United States, like Benchmark Electronics.

234.   The Japan-based Defendants having U.S. subsidiaries (Nippon Chemi-Con, Nichicon, ELNA, Fujitsu, Hitachi, Rohm, Okaya, Shinyei, Soshin, Taitsu, Holy Stone) established and acquired those subsidiaries not only to market, sell and distribute their capacitors in the United States, but also to effectuate and achieve the Conspiracy's aims and purposes.

235.   These U.S. subsidiaries and affiliates are controlled by officers and managers in Japan and their prices are controlled by their Japan-based Defendant corporate parents.

236.   These U.S. subsidiaries had no authority to independently set competitive prices.  Instead, they were bound by their foreign parents' conspiratorial price-fixing agreements (although it may be true that, from time to time, U.S.-based personnel had authority to charge higher prices than those set by the cartel).

237.   Because their Japan-based Defendant parents had significant control over all aspects of their business (*e.g.*, Affected Capacitors' supply, pricing, business strategy, customer relations, sales and personnel decisions), many of the U.S. subsidiaries operated as little more than sales offices in the U.S. for their respective Japan-based Defendant parents. Indeed, as set forth below, many of the Japan-based Defendant parents named their own employees directors, officers or managers of their U.S. subsidiaries, and many of these employees held U.S. executive positions without ever even leaving Japan.  As a result, these U.S. subsidiaries were, as intended, able to advance the cartel aims in the United States.

## F.   UCC Advanced the Conspiracy's Aims and Purposes in the United States for Nippon Chemi-Con

238.   During the Conspiracy Period, UCC, NCC's wholly owned U.S. subsidiary, sold Nippon Chemi-Con aluminum, tantalum and film capacitors to customers in North America.

239.   UCC's business and assets originate from NCC.  UCC's website refers its visitors who want to search its products to NCC's website.

240.   UCC is governed by NCC's directors and other executives, and they appoint UCC's officers.

241.   NCC's customers do not distinguish between NCC and UCC.  Often, customers referred to UCC as "NCC," and UCC personnel field inquiries about NCC's products.

69

242.   During the Conspiracy Period, UCC warehoused and sold millions of dollars in capacitor sales at NCC's direction.  UCC was responsible for helping NCC distribute its capacitors in the United States, and NCC profited from UCC's sales efforts.

243.   In certain instances, NCC sold capacitors to UCC and shipped them to the United States with the understanding that the capacitors would then be purchased (or had already been purchased) by customers in the United States.  NCC's shipping records dating from November 2012 until July 2014 show that NCC shipped tens of millions of dollars of capacitors to UCC and directly to U.S. customers.

244.   UCC provided NCC with monthly sales reports, listing budgets and projections that UCC provided to NCC, which NCC used to evaluate UCC's performance. During the Conspiracy Period, these reports were provided directly to NCC Directors, including Noriaki Kakizaki.

245.   NCC was responsible for the business relationships with the majority of the customers who purchased capacitors from UCC, or from NCC through UCC.  NCC directors traveled to the U.S. to meet with large U.S.-based technology companies, including Apple and Bose, and electronic component distributors such as Digi-Key.

246.   NCC required UCC to obtain its approval on most decisions, including routine business decisions such as promotions of personnel.  UCC was required to "obey" NCC and adhere to its financial and operational guidelines.

247.   Specifically, UCC needed the "consent" and "approval" of NCC for "[s]etting and revisions to standard prices" and "[w]holesale price setting guidelines and methods."  Indeed, UCC needed the "consent" and "approval" of NCC for all important matters pertaining to legal or general affairs.

248.   Most of UCC's top executives were former or current NCC personnel, and many of these persons were paid in Japanese currency by NCC in Japan.  NCC then charged UCC for payment of these salaries.  UCC was severely undercapitalized.  For example, in the 2010-2011 fiscal year, UCC claimed $87 million in sales, had less than $2 million in cash and stayed afloat by obtaining low-interest loans from NCC.

249.   UCC was aware of Conspirators' unlawful agreements to sell capacitors at anticompetitive prices, and knowingly sold capacitors at inflated prices.

250.   UCC's President Tsuneo Ohta met with executives from other cartel members during the relevant time period.  Ohta participated in multiple meetings with sales personnel from U.S. and Japanese subsidiaries of cartel members ROHM, Panasonic and SANYO (including Shinji Takagaki, Chief of SANYO's Sales Division and a regular participant in Cartel meetings).

251.   Similarly, UCC employee Koichi Fumoto met with sales personnel from NEC TOKIN, Panasonic, Hitachi and Nichicon.

252.   Documents produced from Mr. Ohta's files document at least one meeting of the ATC Group.

253.   UCC's top executives and managers were NCC personnel.   Such personnel generally had duties to NCC, notwithstanding their nominal appointments and roles at UCC, and returned to NCC when NCC directed them to do so.

254.   At times during the Conspiracy Period, UCC received complaints from its customers that their prices on capacitors were too high.  UCC personnel regularly "escalated" such complaints by forwarding them to NCC executives, including an NCC director, because

UCC lacked the authority to lower prices of capacitors.  The NCC executives had reason to know of cartel activity and cartel agreements on price and other issues.

255.   UCC was allowed to "consult" with NCC concerning departures from standard pricing for capacitors, as long as the sales were not "wholesale," but NCC had to approve these departures.  Given the existence of the agreement among cartel members to keep prices high, it is more likely than not that UCC was informed of the reason it could not lower prices for customers for aluminum and tantalum capacitors.

256.   At times, cartel members reached out directly to UCC personnel concerning implementing the cartel's agreements, or to exchange information concerning pricing for capacitors for U.S. customers.  For example, in August 2005, a SANYO employee based in California consulted UCC concerning the coordination of their bidding efforts during an online auction held by a U.S.-based PC manufacturer.  The SANYO employee directly communicated with UCC executive Masayuki Kudo.  Mr. Kudo was an NCC employee prior to being assigned to work at UCC in the United States, and he returned to work at NCC in September 2012.

257.   Further, in December 2005, a Panasonic employee exchanged with UCC competitively-sensitive information concerning testing of capacitors for a bid for a U.S. customer.

G.   **Nichicon America Advanced the Conspiracy's Aims and Purposes in the United States for Nichicon**

258.   During the Conspiracy period, Nichicon America, Nichicon Corp.'s wholly owned U.S. subsidiary, sold Nichicon aluminum, tantalum and film capacitors to customers in the United States.

259.   All of Nichicon Corp.'s capacitors sold in the United States are sold through Nichicon America.

260.   Nichicon America does not manufacture any of Nichicon's capacitors sold in the United States; they are all manufactured overseas. Accordingly, Nichicon America is dependent on Nichicon Corp. to provide it with the capacitors it markets, sells or delivers in the United States.

261.   Nichicon Corp. conducts significant business in the United States. Through Nichicon America, Nichicon Corp. sells its capacitors to companies in the U.S. automotive industry, as well as various U.S.-based technology companies and electronic components distributors.

262.   Nichicon's sales to these U.S.-based businesses are largely directed and supervised by Nichicon Corp.'s sales department personnel resident in Japan.   All sales planning, strategy and pricing decisions relating to Nichicon capacitors sold in the United States are made by Nichicon Corp. sales and management personnel in Japan, and Nichicon America employees have limited to no discretion or authority to conduct business without authorization from Nichicon Corp.'s Japan-based sales department leadership.

263.   Because its U.S. sales are important to Nichicon Corp.'s overall business, Nichicon Corp. has regularly assigned key sales and management personnel to positions at Nichicon America.  Sometimes, these individuals perform their Nichicon America duties from Japan, concurrently with their Nichicon Corp. duties.

264.   Nichicon personnel that have been co-listed between Nichicon Corp. and Nichicon America include: Ippei Takeda—Nichicon Corp.'s current Chairman and CEO, who previously served as Representative Director of Nichicon America; Russell Edwards—Nichicon

Corp.'s current Director of its Overseas Sales Department, who previously served in various positions including Vice President of sales with Nichicon America; Hideki Isobe—Nichicon Corp.'s current Deputy General Manager of Business Strategy for the Capacitors Business, who also has historically served in Nichicon America's Engineering and Sales Departments; and Daisuke Ono—Nichicon Corp.'s current Manager of the West Japan Sales Division, who previously served in various sales positions at Nichicon America between 2001 and 2008.

265.   Nichicon personnel holding positions at Nichicon America or who supervised and oversaw Nichicon America sales staff, or did business with the company's U.S. customers were knowledgeable about the existence of the Conspiracy, including its aims and purpose.

266.   Nichicon personnel that participated in cartel meetings and activities and held positions of authority within Nichicon Corp.'s management and sales departments also held positions with Nichicon America.  For example, Mr. Takeda—Nichicon Corp.'s current Chairman and CEO—attended cartel meetings and participated in the ATC meeting's Presidents Committee starting in 2003 while concurrently serving as Nichicon Corp.'s President and CEO and Representative Director of Nichicon America.

267.   Nichicon Corp.'s oversight and direction of Nichicon America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

**H.**      **ROHM USA Advanced the Conspiracy's Aims and Purposes in the United States for ROHM**

268.   During the Conspiracy period, ROHM USA—ROHM Co.'s wholly owned U.S. subsidiary identified on ROHM's web site as one of its "Overseas Operations"—sold ROHM aluminum, tantalum and film capacitors to customers in the United States.

74

269.    Essentially all of ROHM's capacitors sold into the United States are sold through ROHM USA.

270.    ROHM USA does not manufacture any ROHM capacitors sold in the United States; they are all manufactured overseas. Accordingly, ROHM USA is dependent on ROHM Co. for the capacitors it markets, sells or delivers in the United States.

271.    ROHM Co. closely oversees sales of its capacitors in the United States. ROHM Co.'s Euro-American Sales Department is one of its top-level departments within the company, and it oversees ROHM USA.   Accordingly, sales planning, strategy and pricing decisions relating to ROHM's capacitors sold in the United States are directed and overseen by sales and management personnel at ROHM Co. in Japan.

272.    ROHM Co. has regularly assigned its key sales and management personnel to positions at ROHM USA.  Personnel assigned to ROHM USA positions regularly perform those duties concurrently with their ROHM Co. duties.  Some such personnel perform their ROHM USA duties from ROHM Co. offices in Japan and therefore are not physically present in the United States.   Others work in the United States for a period of time, but eventually return to Japan to continue working for ROHM Co.

273.    ROHM personnel holding positions at ROHM USA or who supervised and oversaw ROHM USA sales staff, or did business with the company's U.S. customers were knowledgeable about the existence of the Conspiracy, including its aims and purpose.

274.    ROHM Co.'s control of ROHM USA's sales operations permitted it to effectuate Conspirators' agreed upon pricing and sales strategies in the United States.

I.    **Soshin America Advanced the Conspiracy's Aims and Purposes in the United States for Soshin**

275.   Soshin America—Soshin Co.'s wholly owned U.S. subsidiary identified on Soshin Co.'s website as one of its "Overseas Operators"—sells Sohin Co.'s film capacitors to customers in the United States.

276.   Soshin America is identified on Soshin Co.'s website as one of its "Overseas Operations."

277.   The vast majority of Soshin Co.'s capacitors sold into the United States are sold through Soshin America, with a limited amount sold through distributors or other authorized resellers.

278.   Soshin America does not manufacture any of Soshin's film capacitors sold in the United States; they are all manufactured overseas.  Accordingly, Soshin America is dependent on Soshin Co. for the supply of capacitors it markets, sells or delivers in the United States.

279.   Soshin's capacitor sales in the United States are directed and supervised by Soshin Co.'s sales department personnel resident in Japan.  Accordingly, all sales planning, strategy and pricing decisions relating to Soshin capacitors sold in the United States are made by Soshin Co. sales and management personnel in Japan, and Soshin America employees have no discretion or authority to conduct business without authorization from Soshin Co.'s Japan-based sales department.

280.   From at least 1999 to 2014, nearly all of Soshin America's directors and officers concurrently held sales or management positions at Soshin Co.

281.   Soshin Co. personnel holding positions at Soshin America or doing business with the company's U.S. customers were knowledgeable about the existence of the conspiracy, as well as the cartel's aims and purpose.

282.   Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including Soshin.   During these discussions, Soshin's representatives and their fellow cartel members reported on available demand and pricing activity in various global regions, including information specific to the North American capacitor market.   Soshin Co. used Soshin America to collect the information exchanged at these meetings.

283.   Information about Conspirators' price-fixing was disseminated to the Soshin personnel holding positions at Soshin America or who did business with the company's U.S. customers by those who participated in Cartel meetings.

284.   The Soshin personnel that participated in Cartel meetings and activities held positions of authority within Soshin Co.'s sales and planning departments.

285.   Soshin Co.'s complete control over Soshin America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

J.   **Shinyei America Advanced the Conspiracy's Aims and Purposes in the United States for Shinyei Kaiya**

286.   Shinyei   America—Shinyei   Kaisha's   U.S.-based   wholly   owned subsidiary—sells Shinyei branded film capacitors to customers in the United States.

287.   Shinyei America does not manufacture any of Shinyei's film capacitors sold in the United States; they are all manufactured overseas by Shinyei Kaisha and other affiliates of Shinyei America, including Shinyei Capacitor and formerly Shinyei Tech. Accordingly, Shinyei America is dependent on Shinyei Kaisha to provide it with the capacitors it markets, sells or delivers in the United States.

288.   The vast majority of Shinyei's capacitors sold into the United States are sold through Shinyei America.

289.   Shinyei's capacitors sales in the United States are directed and supervised by Shinyei sales department personnel resident in Japan.   Accordingly, all sales planning, strategy and pricing decisions relating to Shinyei's capacitors sold in the United States are made by Shinyei sales and management personnel in Japan, and Shinyei America employees have little to no discretion or authority to conduct business without authorization from Shinyei's Japan-based sales department.

290.   Shinyei Kaisha has regularly assigned key sales and management personnel from subsidiaries such as Shinyei Tech/Shinyei Capacitor to positions at Shinyei America.   Personnel assigned to Shinyei America positions regularly perform those duties concurrently with their Shinyei Tech/Shinyei Capacitors duties.   Some such personnel perform their Shinyei America duties from Shinyei offices in Japan and therefore are not physically present in the United States.

291.   Shinyei Tech/Shinyei Capacitor personnel holding positions at Shinyei America or doing business with the company's U.S. customers were knowledgeable about the existence of Conspirators' cartel, as well as the cartel's aims and purpose.

292.   Demand for Capacitors in the United States was regularly discussed among cartel members, including Shinyei.   During these discussions, Shinyei's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors in various regions, including information specific to the North American capacitor market.   Shinyei used Shinyei America to collect the information exchanged at these meetings.

293.   Information regarding the cartel's agreements concerning pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to

78

the Shinyei personnel holding positions at Shinyei America, who supervised and oversaw Shinyei America sales staff or did business with the company's U.S. customers.

294.    The Shinyei personnel that participated in Cartel meetings and activities held positions of authority within Shinyei Tech/Shinyei Capacitor.

295.    Shinyei's control of Shinyei America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

**K.    Okaya America Advanced the Conspiracy's Aims and Purposes in the United States for Okaya**

296.    Okaya America—Okaya Co.'s U.S.-based wholly owned subsidiary— sells Okaya branded film capacitors to customers in the United States.

297.    Okaya America does not manufacture any of Okaya's film capacitors sold in the United States; they are all manufactured overseas by other Okaya entities.  Accordingly, Okaya America is dependent on Okaya Co. to provide it with the capacitors it markets, sells or delivers in the United States.

298.    All of Okaya's capacitors sold in the United States are sold through Okaya America.

299.    Okaya's capacitors sales in the United States are directed and supervised by Okaya Co.'s sales department personnel resident in Japan.  For example, materials outlining Okaya's company-wide internal process controls indicate that any price quotations must be approved by the Okaya Co.'s Overseas Sales Group Leader.  Accordingly, all sales planning, strategy and pricing decisions relating to Okaya's capacitors sold in the United States are made or supervised by Okaya sales and management personnel in Japan, and Okaya America employees have little to no discretion or authority to conduct business without authorization from Okaya's Japan-based sales department.

300.   Okaya Co.'s oversight of Okaya America's sales efforts and product pricing is in line with its overall close management of the U.S.-based subsidiary as one of its domestic sales offices.

301.   Okaya Co. has regularly assigned sales and management personnel to positions at Okaya America.  Personnel assigned to Okaya America positions regularly perform those duties concurrently with their Okaya Co. duties.  Some such personnel perform their Okaya America duties from Okaya offices in Japan and therefore are not physically present in the United States.  Others work in the United States for a period of time, but eventually return to Japan to continue working for Okaya Co.

302.   Okaya Co. personnel holding positions at Okaya America or doing business with the company's U.S. customers were knowledgeable about the existence of the Conspiracy, as well as the cartel's aims and purpose.

303.   Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including Okaya.   During cartel meetings, Okaya's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors in various global regions, including information specific to the North American capacitor market.  Okaya used Okaya America to collect the information exchanged at these meetings.

304.   Information regarding the cartel's agreements concerning pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to Okaya personnel holding positions at Okaya America, who supervised and oversaw Okaya America sales staff or did business with the company's U.S. customers.

305. Okaya Co.'s control of Okaya America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

## L. Taitsu America Advanced the Conspiracy's Aims and Purposes in the United States for Taitsu Corp.

306. Taitsu America also lacks corporate separateness from its parent, Taitsu Corp.

307. Taitsu America does not manufacture any of Taitsu's film capacitors sold in the United States; they are all manufactured overseas by Taitsu Corp. or Taitsu Corp.'s other business units and subsidiaries. Accordingly, Taitsu America is dependent on Taitsu Corp. to provide it with the capacitors it markets, sells or delivers in the United States.

308. Virtually all of Taitsu's capacitors sold in the United States are sold through Taitsu America.

309. Taitsu's capacitors sales in the United States are directed and supervised by Taitsu's sales department personnel resident in Japan. Accordingly, all sales planning, strategy and pricing decisions relating to Taitsu's capacitors sold in the United States are made or supervised by Taitsu's sales and management personnel in Japan.

310. Taitsu America does not have its own domain name. It appears on its parent's website only in its capacity as Taitsu Corp.'s American "Sales Office," accompanied only by contact information for the "office" and no further corporate details (http://www.taitsu.co.jp/english/hub/USA/index.html). The "History of Company" section of Taitsu Corp.'s website states that in 1997 (the year of the Conspiracy's inception) it "[e]stablished distributor Taitsu America, Inc. in U.S.A."

311. Taitsu Corp.'s website illustrates Taitsu America as an integral part of "Taitsu's Global Supply Network," which spans North America and Asia

(http://www.taitsu.co.jp/english/hub/).    Taitsu Corp.'s company profile stresses that Taitsu Corp. has "been proactive in overseas expansion of our business in anticipation of globalization. We now have bases in Japan and other parts of the world including the United States" (http://www.taitsu.co.jp/english/company/).

312.    Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including Taitsu.    During cartel meetings, Taitsu's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors in various global regions, including information specific to the North American capacitor market.    Taitsu used Taitsu America to collect the information exchanged at these meetings.

313.    Information regarding the cartel's agreements regarding pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to Taitsu personnel holding positions at Taitsu America, who supervised and oversaw Taitsu America sales staff or did business with the company's U.S. customers.

314.    Taistsu Corp.'s control of Taitsu America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

**M.    ELNA America Advanced the Conspiracy's Aims and Purposes in the United States for ELNA**

315.    ELNA America also lacks corporate separateness from its parent, ELNA Co.

316.    ELNA America does not manufacture any of ELNA's Affected Capacitors sold in the United States; they are all manufactured overseas by ELNA Co. or ELNA Co.'s other business units and subsidiaries.    Accordingly, ELNA America is dependent on ELNA Co. to provide it with the capacitors it markets, sells or delivers in the United States.

82

317.   Virtually all of ELNA's capacitors sold in the United States are sold through ELNA America.

318.   ELNA's capacitors sales in the United States are directed and supervised by ELNA's sales department personnel resident in Japan.   Accordingly, all sales planning, strategy and pricing decisions relating to ELNA's capacitors sold in the United States are made or supervised by ELNA's sales and management personnel in Japan.

319.   ELNA America's "About Us" page asserts that it (a) has been a "wholly-owned subsidiary of ELNA Co. Ltd." for over 35 years; (b) is "responsible for sales, service, and support to customers in North and South America"; and (c) has customers in "all market segments of the electronics industry."   The "Locations" webpage depicts a global network of ELNA Co.'s worldwide offices.   The "Products" and "News" webpages directly link to the "Capacitors" and "News release" webpages of ELNA Co.'s website.

320.   ELNA Co.'s website (www.elna.co.jp/en/) likewise shows a lack of corporate separateness from ELNA America.   ELNA Co.'s "Corporate profile & History" webpage states that ELNA Co. established "ELNA AMERICA INC. as the sales company in the USA" in March 1977 (http://www.elna.co.jp/en/company/data.html).   The "News release" webpage has posted consolidated balance sheets for ELNA Co. and its consolidated subsidiaries (including wholly owned ELNA America) dating back to 2005.

321.   Unlike ELNA Co.'s website, ELNA America's website does not list an independent board of directors.

322.   Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including ELNA.   During cartel meetings, ELNA's representatives and their fellow cartel members reported on available demand and pricing

83

activity for Affected Capacitors in various global regions, including information specific to the North American capacitor market. ELNA used ELNA America to collect the information exchanged at these meetings.

323. Information regarding the cartel's agreements regarding pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to ELNA personnel holding positions at ELNA America, who supervised and oversaw ELNA America sales staff or did business with the company's U.S. customers.

324. ELNA Co.'s control of ELNA America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

**N.** **Hitachi Chemical America Advanced the Conspiracy's Aims and Purposes in the United States for Hitachi**

325. Hitachi Chemical America also lacks corporate separateness from Hitachi Chemical.

326. Hitachi Chemical America did not manufacture any of Hitachi's Affected Capacitors sold in the United States; they were all manufactured overseas by Hitachi Chemical or Hitachi Chemical's other business units and subsidiaries (including Hitachi AIC). Accordingly, Hitachi Chemical America is dependent on Hitachi Chemical to provide it with the capacitors it markets, sells or delivers in the United States.

327. Virtually all of Hitachi's capacitors sold in the United States were sold through Hitachi Chemical America.

328. Hitachi's capacitors sales in the United States were directed and supervised by Hitachi's sales department personnel residing in Japan. Accordingly, all sales planning, strategy and pricing decisions relating to Hitachi's capacitors sold in the United States were made or supervised by Hitachi's sales and management personnel in Japan.

Case 4:17-cv-01219   Document 1   Filed on 04/18/17 in TXSD   Page 85 of 100


329.  Hitachi Chemical's website (www.hitachi-chem.co.jp/english/) lists Hitachi Chemical America on its "Hitachi Chemical Group [Overseas]" webpage.  Hitachi Chemical America is the "[r]egional head quarter for Hitachi Chemical group companies in the U.S.A." and is responsible for "[s]ales & marketing of functional materials and advanced components and systems" and "R[esearch] & D[evelopment] in biotechnology (http://www.hitachi-chem.co.jp/english/company/group.html#usa)."   Per Hitachi Chemical's website, the "Hitachi Chemical Group Identity" is a "globally shared structure of our philosophy and values."

330.  Hitachi Chemical posted consolidated financial reports for itself and its consolidated subsidiaries (including Hitachi Chemical America) in its 2014 Annual Report.

331.  Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including Hitachi.   During cartel meetings, Hitachi's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors in various global regions, including information specific to the North American capacitor market.   Hitachi used Hitachi Chemical America to collect the information exchanged at these meetings.

332.  Information regarding the cartel's agreements regarding pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to Hitachi personnel holding positions at Hitachi Chemical America, who supervised and oversaw Hitachi Chemical America sales staff or did business with the company's U.S. customers.

333.  Hitachi Chemical's control of Hitachi Chemical America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

## VIII.   ANTICOMPETITIVE EFFECTS OF THE CONSPIRACY

334.   Defendants' concerted and collusive actions as alleged herein artificially inflated the prices of Affected Capacitors in the U.S. and abroad.

335.   In spite of oversupply, waning demand and a severe global recession, throughout the Conspiracy Period, Affected Capacitors prices decreased less than they would have under ordinary free market conditions, stabilized and, in some instances, even increased.

336.   As a result, Benchmark Electronics and other purchasers collectively paid overcharges totaling hundreds of millions of dollars or more for trillions of capacitors purchased throughout the Conspiracy Period.

337.   In 2005, aluminum capacitors began to stop their price decline from approximately $55.06 per thousand in 2003.  Industry data from 2005 shows that the price per unit for aluminum electrolytic capacitors was $46.76 per thousand units, and the per-unit prices hovered between approximately $40.00 and $46.00 per thousand until 2013.

338.   In 2005, film capacitors demonstrated a price increase of nearly $1.63 per thousand units from 2004, and the per unit price continued to rise on most types of film capacitors until at least the beginning of 2009, after which the price of film capacitors declined at times, though this decline was less severe than it would have been in an unfettered market due to the Conspirators' cartel.

339.   Economic analysis of the impact of the cartel is in its earliest stage, and much of the relevant information is in the possession and control of Conspirators and not Plaintiffs, so the full nature and extent of the Conspiracy's anticompetitive effects are unknown to Plaintiffs at this time.

## IX.   CURRENT U.S. AND INTERNATIONAL ANTITRUST INVESTIGATIONS INTO ANTICOMPETITIVE PRACTICES IN THE CAPACITOR INDUSTRY

340.   Defendants' conspiracy to artificially raise, maintain or stabilize prices for aluminum, tantalum and film capacitors, and to restrict the output of Affected Capacitors, was first discovered in or around 2014 by law enforcement and regulatory authorities in the United States and throughout Asia.

341.   In April 2014, the DOJ Antitrust Division confirmed to industry sources that the government had opened an investigation into price-fixing in the Affected Capacitor industry.

342.   The San Francisco office of the DOJ's Antitrust Division is leading the DOJ's ongoing investigation into the Affected Capacitor industry.

343.   Defendant Panasonic became the first Conspirator to approach U.S. and Chinese authorities to self-report its involvement in the conspiracy and to request prosecutorial leniency and amnesty.

344.   As a required part of applying for leniency through the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), Panasonic admitted to price-fixing in the Affected Capacitor market.  ACPERA provides criminal and civil leniency benefits for the first price fixing conspiracy participant who voluntarily comes forward and admits its anticompetitive conduct to the DOJ.

345.   In connection with its ACPERA application, Panasonic proffered facts and documents regarding the scope of its conspiratorial conduct.  Plaintiffs draw support for many of the allegations pled herein from that information.

346.   On September 2, 2015, the DOJ announced the first criminal charges in connection with the Conspiracy—against NEC TOKIN.  The DOJ's Information against NEC

TOKIN dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014," and charged that the Conspiracy sought "to suppress and eliminate competition by fixing and rigging bids of certain electrolytic capacitors in the United States and elsewhere." The Information further alleged that NEC TOKIN "knowingly joined and participated in the charged conspiracy from at least as early as April 2002 until in or about December 2013." At a hearing held before the Honorable James Donato of the United States District Court for the Northern District of California on January 21, 2016, NEC TOKIN pleaded guilty "to the violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, that is charged in the Information."

347. On September 2, 2015, the DOJ filed an information charging Defendant NEC TOKIN Corporation with "knowingly" joining and participating in a conspiracy violating Section 1 of the Sherman Act by entering into and engaging in a combination and conspiracy "to suppress and eliminate competition by fixing and rigging bids of certain electrolytic capacitors in the United States and elsewhere." The information charged NEC TOKIN Corporation with "knowingly" joining and participating in a conspiracy with its competitors from "at least as early as A0ril 2002 until in or about December 2013." In addition, the Information dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014." On January 25, 2016, NEC TOKIN Corporation pleaded guilty to conspiracy to fix the prices of electrolytic capacitors as charged in the information.

348. On April 7, 2016, the DOJ announced that Hitachi Chemical agreed to plead guilty to conspiring with competitors to fix prices for electrolytic capacitors sold to customers in the United States and elsewhere. Like the DOJ's Information against NEC TOKIN, the DOJ's Information against Hitachi also dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014." The Information charged Hitachi

Chemical with conspiring with its competitors between 2002 and 2010.  On June 9, 2016, Hitachi Chemical pleaded guilty to conspiring to the prices of electrolytic capacitors as charged in the Information.

349.   On April 7, 2016, the DOJ announced that Hitachi Chemical Co., Ltd. agreed to plead guilty to conspiring with competitors to fix prices for electrolytic capacitors sold to customers in the United States and elsewhere.  Like the DOJ's Information against NEC TOKIN, the DOJ's Information against Hitachi also dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014."  The Information charged Hitachi Chemical Co., Ltd. with "knowingly" joining and participating in a conspiracy with its competitors between 2002 and 2010.  On June 9, 2016 Hitachi Chemical Co., Ltd. pleaded guilty to conspiring to fix the prices of electrolytic capacitors as charged in the Information.

350.   On August 22, 2016, the DOJ announced that Rubycon Corporation, ELNA Co., Ltd. and Holy Stone Holdings Co., Ltd. had agreed to plead guilty for conspiring to fix prices for electrolytic capacitors sold to customers in the United States and elsewhere.

351.   The DOJ's Information against Rubycon Corporation charged the company with conspiring with its competitors to fix prices and rig bids for certain electrolytic capacitors in the United States and elsewhere.  The Information charged that Rubycon Corporation "knowingly joined and participated in the charged conspiracy from at least as early as August 2002 until in or about January 2014.  In addition, the Information dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014."  On October 2, 2016, Defendant Rubycon Corporation pleaded guilty to conspiring to fix the prices of electrolytic capacitors as charged in the Information.

352.     The DOJ's Information against ELNA Co., Ltd. charged the company with conspiring with its competitors to fix prices and rig bids for certain electrolytic capacitors in the United States and elsewhere.  The Information charged that ELNA Co., Ltd. "knowingly joined and participated in the charged conspiracy from at least as early as August 2002 until in or about January 2014.  In addition, the Information dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014."

353.     The DOJ's Information against Holy Stone Holdings Co., Ltd. charged the company with conspiring with its competitors to fix prices and rig bids for certain electrolytic capacitors in the United States and elsewhere.  The Information charged that Holy Stone Holdings Co., Ltd. "knowingly joined and participated in the charged conspiracy from in or about April 2010 until in or about January 2014."  In addition, the Information dated the conspiracy from "at least as early as September 1997" until "in or about January 2014."

354.     On February 8, 2017, the DOJ announced that Matsuo Electric Co., Ltd. agreed to plead guilty to conspiring with competitors to fix prices and rig bids for electrolytic capacitors sold to customers in the United States and elsewhere.  The DOJ's Information charged that Matsuo Electric Co., Ltd "knowingly joined and participated in the charged conspiracy from at least as early as November 2001 until in or about January 2014."  The Information dated the conspiracy from "at least as early as September 1997" until "in or about January 2014."

355.     In addition to the corporate defendants, the DOJ has also charged ten of Defendants' executives with conspiring to fix prices and rig bids for electrolytic capacitors.

356.     The DOJ has reportedly been coordinating its efforts to investigate the capacitor industry with the People's Republic of China's National Development and Reform

Commission ("NDRC"), an agency entrusted with regulating price-related anticompetitive activity by the Chinese State Council.

357.   On or about July 2, 2014, the NDRC publicly confirmed its investigation into the capacitor industry through a report published in the China Price Supervision and Antitrust Journal and written by Xu Kunlin, Director-General of the NDRC's Price Supervision and Antimonopoly Bureau.  In this report, Xu revealed that one Japanese capacitor company self-reported its cartel activity in March 2014, and that this company along with other Japanese capacitor manufacturers held regular conferences to exchange market information related to their products. Media and industry sources have quoted Xu as saying that the Japanese manufacturer seeking amnesty would receive complete leniency.

358.   On March 29, 2016, the Japan Fair Trade Commission ("JFTC") issued Cease and Desist Orders and Surcharge Payment Orders against Defendants Nichicon, Nippon Chemi-Con, Rubycon, Hitachi, Matsuo, NEC TOKIN and Vishay Polytech for their participation in the Conspiracy.  The orders were the product of an on-going investigation that the JFTC began in or about June 2014 after Panasonic self-reported its involvement in the Conspiracy.  According to media reports citing sources close to the JFTC's investigation, sales executives and other officials from the Conspirators discussed and agreed upon price increases for Affected Capacitors for at least several years during the Conspiracy Period.

359.   Since the beginning of 2014, investigations into the capacitor industry also have been opened by the South Korean Fair Trade Commission, The Taiwanese Fair Trade Commission, the European Union's Competition Authority, and Brazil's Council for Economic Defense (CADE).

360. On December 9, 2015, the South Korean Fair Trade Commission determined that Defendants Nippon Chemi-Con, Rubycon, Elna, Sanyo, Nichicon, NEC TOKIN Matsuo and Vishay Polytech violated the Korean Fair Trade Act by exchanging sensitive business information and reaching agreements to restrain competition in Affected Capacitors.

361. In November 2015, the European Union's antitrust regulator filed charges against ten Asian manufacturing companies that it suspects may have participated in a cartel to influence the sale of Affected Capacitors.

362. In December 2015, Taiwan's Fair Trade Commission imposed a record fine of approximately $176.6 million on ten international capacitor suppliers for price collusion and joint monopolization. Taiwan's Fair Trade Commission Vice Chairman, Chiu Yung-ho, stated that the ruling was reached as a result of a joint investigation with the European Union, Singapore and the United States.

363. Sources suggest that certain Defendants have been subject to raids orchestrated by authorities from around the world. To date, some Defendants have publicly commented about their being subject to these raids.

364. During March 2014, the NDRC conducted several raids on Chinese operations of Japanese capacitors manufacturers. Following Chinese action, there have been reported raids in the European Union, Japan and Korea.

365. Defendants Panasonic and SANYO confirmed that they were raided by both the JFTC and South Korean authorities.

641354.1

366.   Defendant NEC TOKIN confirmed that it was contacted or raided by American, Chinese and European authorities and has stated that it is cooperating with authorities.

367.   Defendant TOSHIN KOGYO confirmed that it was contacted by Japanese, Chinese and Taiwanese authorities.

## X.   FRAUDULENT CONCEALMENT, EQUITABLE TOLLING, AND THE CONTINUING TORT DOCTRINE

368.   During the Conspiracy Period, Benchmark Electronics had neither actual nor constructive knowledge of the pertinent facts upon which its claims are predicated, despite diligence in trying to discover such facts.  Benchmark Electronics could not have discovered through the exercise of reasonable diligence the existence of the Conspiracy alleged herein until in or about March 2014, when investigations by the DOJ and competition and law enforcement authorities in the People's Republic of China, Japan, Taiwan, South Korea and the European Union were first made public.

369.   Conspirators knew their activities were illegal and therefore agreed to keep the Conspiracy, their meetings regarding the Conspiracy, and all documents evidencing the Conspiracy highly confidential, even within their own companies.

370.   Conspirators did not take or distribute official minutes or reports concerning the secret cartel meetings discussed above because they recognized sensitive competitive information was exchanged amongst them during these meetings.  Any disclosure of the matters, information and data discussed in the many cartel meetings attended by Conspirators throughout the Conspiracy Period could expose the Conspiracy, thereby frustrating its purpose and exposing Conspirators to criminal and civil liability throughout the globe, including in the United States.

371.   A 2006 email from a SANYO employee reflects Conspirators' efforts to keep their collusive actions secret:  "[E]xchanging information is useful . . . However, it may become a double-edged sword at times.  To the extent possible, try to exchange verbally so that no evidence is left behind.  Especially pricing figures and important presentation materials."

372.   The secret cartel meetings are evidenced by emails, summaries and notes drafted by the employees of Conspirators who attended the meetings.  These documents, which evince Conspirators' collusive discussions and unlawful agreements, were circulated only among a limited number of employees who were responsible at their respective companies for implementing the cartel's anticompetitive agreements.  These emails, summaries and notes regularly included instructions from their authors to guard the documents with the utmost caution due to the sensitive competitive information contained therein.

373.   For example, SANYO representative Shinichi Torii circulated his October 8, 2008 MK meeting notes to company members, accompanied by the following warning: "Since [t]he gathering should not be disclosed to the public, please be careful when handling the contents of the present report."

374.   SANYO employee Shinji Takagaki warned in an October 15, 2005 email regarding a customer's frustrations with undersupply and excess lead times: "information leakage regarding this matter would cause grave problems that would lead directly to a suspension of transaction.  We urgently request you to take the utmost care in this matter."

375.   Similar conspiratorial correspondences read, "[p]lease do not distribute this email unless it is absolutely necessary[,]" "[p]lease take the utmost care in handling this report[,]" and, "[o]nce you read this email, please delete it."

376.    Conspirators also guarded the identities of Conspirators and their relevant employees by using code to refer to such participants in written communications, *e.g.*, "Company E," "Company H," "Company M," "Company N," "Company NC," "Company R."

377.    Conspirators further concealed the Conspiracy from Affected Capacitors consumers by providing pre-textual justifications for the pricing changes and the reductions in output and increased production lead times that occurred during the Conspiracy Period, citing materials shortages, labor shortages and weather events.

378.    For example, in 2010, Defendants Nichicon, Nippon Chemi-Con and Panasonic each made a number of public statements to industry and technology media in which they attributed supply limitations and price quote adjustments to shortages of aluminum foil and increasing costs for other raw materials required for manufacturing.

379.    With respect to tantalum capacitors, Conspirators cited a worldwide shortage of tantalum.  In 2010 and 2011, Defendant Panasonic made a number of public statements to industry and technology media attributing supply limitations and pricing adjustments for its tantalum electrolytic capacitors to raw materials supply issues.

380.    These explanations are belied by industry and other media reports that criticize the lack of true visibility into the market for tantalum, highlight tantalum capacitor manufacturers' close ties and business arrangements with tantalum mining operations, and recognize manufacturers' efforts to process certain raw materials in-house.

381.    Conspirators also made numerous misleading excuses to justify their price increases, including alleged labor shortages and shipping delays due to weather events in Asia.

382.   More specifically, from 2011 to 2013, Defendants Hitachi, Nippon Chemi-Con, Nichicon, Rubycon and ELNA attributed their production delays to the lasting effects of the 2011 Tohoku earthquake and tsunami in eastern Japan.

383.   In 2011, Defendants NEC TOKIN and ROHM attributed production delays to flooding in Thailand.

384.   Conspirators' pre-textual, materially false and misleading statements were designed to conceal their conspiracy and convince Benchmark Electronics and other customers that the artificially high Affected Capacitors pricing and increased production lead times were the natural result of ordinary market forces, rather than the product of any conspiracy.

385.   As a result of the fraudulent concealment of the Conspiracy by Defendants and their co-conspirators, the running of any applicable statute of limitations has been tolled with respect to any claims that Benchmark Electronics has as a result of the anticompetitive and unlawful conduct alleged herein.

386.   Also as a result of Defendants' fraudulent concealment of the Conspiracy, Defendants are equitably estopped from asserting statutes of limitations defenses.

387.   Further, the multi-year Conspiracy constitutes a continuing tort, and therefore, the statute of limitations cannot accrue until the last act of Conspirators' unlawful conduct.

## XI.   PLAINTIFFS' INJURIES

388.   Benchmark Electronics suffered direct, substantial and reasonably foreseeable injuries as a purchaser of Affected Capacitors as a result of the Conspiracy.

389.   Benchmark Electronics purchased Affected Capacitors directly from certain of the Conspirators at prices that were artificially inflated as a result of the Conspiracy.

390.   Throughout the Conspiracy Period, Conspirators controlled the market for Affected Capacitors, forcing Benchmark Electronics to purchase Affected Capacitors at artificially inflated prices.

391.   Accordingly, Benchmark Electronics suffered antitrust injury in connection with its purchases of Affected Capacitors during the Conspiracy Period in an amount equal to the total of the overcharges it paid, to be determined at trial.

## XII.   CLAIM FOR RELIEF

### Restraint of Trade in Violation of the Sherman Act § 1,
### 15 U.S.C. § 1 (Alleged against all Defendants)

392.   Plaintiffs hereby incorporate and re-allege each and every allegation set forth in the preceding paragraphs of this Complaint.

393.   Beginning no later than September 1, 1997 and continuing through approximately March 31, 2014 (the exact dates being unknown to Plaintiffs and exclusively within the knowledge of Conspirators), Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of aluminum, tantalum and film capacitors sold directly to U.S. purchasers.

394.   In particular, Defendants and their co-conspirators have agreed, combined and conspired to raise, fix, maintain or stabilize the prices of aluminum, tantalum and film capacitors sold to United States purchasers during the Conspiracy Period.

395.   As a result of Defendants' unlawful conduct, prices for Affected Capacitors were raised, fixed, maintained and stabilized in the United States.

396.    The agreement, combination or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding and concerted action among Conspirators.

397.    For purposes of formulating and effectuating their agreement, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined or conspired to do, including:

(a)    Participating in meetings and conversations to discuss pricing and supply of Affected Capacitors;

(b)    Allocating customers and market shares between themselves through bid-rigging;

(c)    Communicating (both orally and verbally) to fix target prices, floor prices and price ranges for Affected Capacitors;

(d)    Agreeing to manipulate prices and supply of Affected Capacitors sold in the U.S. in a manner that deprived direct purchasers of free and open competition;

(e)    Issuing price announcements and price quotations in accordance with the agreements reached;

(f)    Selling Affected Capacitors to customers in the U.S. at noncompetitive prices;

(g)    Exchanging competitively sensitive information, including customer information and sales data;

(h)    Setting artificial and unjustified production lead times to limit the available supply of Affected Capacitors available for sale to U.S. purchasers during the Conspiracy period; and

(i)      Providing false statements to the public to explain increased prices and undersupply for Affected Capacitors.

398.   As a result of the unlawful conduct and acts undertaken in furtherance of the Conspiracy by Defendants and their co-conspirators, Benchmark Electronics' business and property were injured in that it paid more for Affected Capacitors than it would have paid in the absence of Conspirators' unlawful conduct.

## XIII.   DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs demand judgment in Plaintiffs' favor and against Defendants adjudging and decreeing that:

A.      Defendants engaged in a contract, combination and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and that Benchmark Electronics' business and property were injured as a result of Defendants' violations;

B.      Plaintiffs shall recover damages sustained by them as provided by the federal antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Plaintiffs shall be awarded pre-judgment and post-judgment interest on the damages they suffered, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

D.      Plaintiffs shall recover their costs and fees incurred in this suit, including reasonable attorneys' fees as provided by applicable law; and

E.      Plaintiffs shall receive such other or further relief as may be just and proper.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

the claims asserted in this complaint so triable.


DATE:  April 18, 2017

Respectfully submitted,

_____/s/ Lee L. Kaplan_____

Lee L. Kaplan, *Lead Counsel*
Texas State Bar No. 11094400
S.D. Id. No. 1840
SMYSER KAPLAN & VESELKA, L.L.P.
700 Louisiana St., Suite 2300
Houston, Texas 77002
(713) 221-2323
(713) 221-2320 (fax)
lkaplan@skv.com

COUNSEL FOR THE BENCHMARK
ELECTRONICS  PLAINTIFFS


OF COUNSEL:

Robert W. Turken
Florida State Bar No. 306355 (pro hac vice pending)
Scott N. Wagner
Florida State Bar No. 51662 (pro hac vice pending)
Lori P. Lustrin
Florida State Bar No. 59228 (pro hac vice pending)
BILZIN SUMBERG BAENA PRICE &
AXELROD LLP
1450 Brickell Ave., Suite 2300
Miami, Florida  33131-3456
Telephone:  (305) 374-7580
Facsimile:  (305) 374-7593
Email: rturken@bilzin.com
Email: swagner@bilzin.com
Email: llustrin@bilzin.com

COUNSEL FOR THE BENCHMARK
ELECTRONICS  PLAINTIFFS